GERALD J. KELLEHER & another[1] *vs.* BOARD OF
SELECTMEN OF PEMBROKE.

Plymouth. February 15, 1973. — March 20, 1973.

Present: HALE, C.J., GOODMAN, & GRANT, JJ.

*Real Property,* Removal of material. *Municipal Corporations,* By-laws and ordinances. *Constitutional Law,* Material removal.

Under the comprehensive earth removal by-law of a town prohibiting "[a]ll removal of soil, loam, sand, gravel or rock from land . . . unless done in strict compliance with a permit granted hereunder by the [b]oard of [s]electmen," the board was warranted in denying a permit for earth removal to the owner of a tract from which some 350,000 cubic yards of material had been removed in the eight month period between the hearing on his application for the permit and the date of a plan submitted by him, where the plan did not show present and proposed contours or the location of a public way affected, the owner's presentation did not comply with important provisions of the by-law, and it appeared that neighboring residents had been unreasonably disturbed by reason of "excessive and continuous noise, dust [and] vibrations," and that the board specifically found that the removal operation "constituted a nuisance" and would result in "depreciation of neighboring properties and substantial interference with . . . the normal use and enjoyment" thereof. [178-183]

Under the by-law of a town prohibiting earth removal unless done in compliance with a permit granted by the board of selectmen, the board could not properly consider, or base its denial of an application for a permit on, a likelihood that truck traffic engendered by an earth removal operation would create or continue a traffic hazard; a possible destruction of the value of a portion of the applicant's own land; the suitability of the soil of the applicant's land for sanitary disposal and drainage systems in the area; or the loaming and reseeding of areas lawfully disturbed by the applicant prior to the effective date of the by-law but lying outside the area of proposed further excavation. [183-184]

[1] John D. Walsh, Jr., a plaintiff by intervention in the Superior Court but not an appellant in this court.

A by-law of a town prohibiting earth removal unless done in compliance with a permit granted by the board of selectmen, adopted pursuant to G. L. c. 40, § 21 (17), as amended by St. 1967, c. 870, and containing reasonable regulations providing adequate standards for the guidance of the board, could constitutionally be applied to earth removal operations existing at the adoption of the by-law. [185-186]

BILL IN EQUITY filed in the Superior Court on November 11, 1971.

The suit was heard by *Taveira, J.*

*Melvin S. Louison* (*Robert G. Clark, Jr.,* with him) for Gerald J. Kelleher.

*Henry M. Paro,* Town Counsel, for the Board of Selectmen of Pembroke.

GRANT, J.   The plaintiff has appealed from a final decree of the Superior Court dismissing his amended bill of complaint brought against the board of selectmen (board) of the town of Pembroke (town) to secure an injunction against the town's[2] further interfering with the plaintiff's conduct of an earth removal business in the town in the manner in which that business was conducted immediately prior to the effective date of an earth removal by-law (G. L. c. 40, § 21[17], as most recently amended by St. 1967, c. 870)[3] adopted by the town in 1971. The bill alleges that the "[s]electmen in their actions pertaining to . . . the plaintiff['s property] has [sic] acted arbitrarily, capri-

---

[2] As it will not affect our disposition of this case we pass the point that the prayers of the amended bill seek relief against the town, which has not been joined as a party defendant.

[3] "Towns may, for the purposes hereinafter named, make such . . . by-laws, not repugnant to law, as they may judge most conducive to their welfare, which shall be binding upon all inhabitants thereof and all persons within their limits. . . . (17) For prohibiting or regulating the removal of soil, loam, sand or gravel from land not in public use in the whole or in specified districts of the town. The superior court shall have jurisdiction in equity to compel compliance with any . . . by-law made hereunder. . . . Any . . . by-law prohibiting such removal hereunder shall not apply to any soil, loam, sand or gravel which is the subject of a permit or license issued under the authority of the town or by the appropriate licensing board of such town or by the board of appeal, or which is to be removed in compliance with the requirements of a subdivision plan approved by the town planning board." See, generally, *Butler* v. *East Bridgewater,* 330 Mass. 33; *Stow* v. *Marinelli,* 352 Mass. 738; *Goodwin* v. *Selectmen of Hopkinton,* 358 Mass. 164; *Glacier Sand & Stone Co. Inc.* v. *Board of Appeals of Westwood,* 362 Mass. 239. Cf. *North Reading* v. *Drinkwater,* 309 Mass. 200.

ciously, and injudiciously and have further acted in reckless disregard of the property rights of the plaintiff" and that "said [by-law] is unconstitutional in its purpose and scope as applied to your petitioner's operation." The trial judge filed findings (later adopted as a statutory report), rulings and an order for decree. The evidence is reported. The facts[4] and the provisions of the challenged by-law may be summarized as follows.

In 1970 one Walsh, a real estate broker doing business in Pembroke, acquired a tract of vacant land comprising some one hundred fifty acres which lay partly in Marshfield but mostly in Pembroke, which was bound northerly for a total distance of approximately 1,500 feet in Pembroke by a public way known as Oak Street and easterly in Marshfield by a portion of the Southeast Expressway (Route 3) and which was bisected from north to south in Pembroke by a dirt road but public way known as Winter Street, which had formerly run from Pembroke to Marshfield but had been dead ended by the construction of the expressway in 1962 or 1963. No active earth removal operation was in progress on any part of the tract at the time of Walsh's purchase, although undisclosed quantities of gravel had been removed in the past from a twenty or twenty-five acre portion of the tract in Pembroke, principally in connection with the construction of the expressway. A strip of the Pembroke portion of the tract lying along its westerly boundary and having a frontage of approximately five hundred sixty feet on Oak Street was zoned for residential uses; the balance of the Pembroke portion was zoned for industrial uses.

Walsh proceeded to have an engineer prepare a plan for the industrial development of the Pembroke portion zoned for that purpose which showed the boundaries of the entire

---

[4] The facts recited herein are a composite of those found by the judge, those found by ourselves, and those recited in the hereinafter discussed decision of the selectmen which are not challenged by the plaintiff. We warn that we are somewhat hampered in our understanding of certain geographical facts because the stenographic transcript does not disclose what portions of various plans and photographs were being referred to by the witnesses as they testified in court. See *Seekonk* v. *John J. McHale & Sons, Inc.* 325 Mass. 271, 272.

tract, the boundaries of the zoning districts in Pembroke,[5] proposed access roads to be constructed in Pembroke, an area of existing tree screening around the perimeter of the tract (except the portion bounded by the expressway), the location of a brook known as Pudding Brook running through the southerly portion of the tract, certain grades and contours existing as of March 11, 1971, and the considerably lower grades and contours at and in accordance with which Walsh proposed to site buildings in the industrially zoned portion of the property in Pembroke. This plan, which we shall refer to as the March plan, showed the locations of Oak Street and the expressway but not the location, or the existence, of Winter Street. Walsh showed the March plan to the selectmen when he met with them in May of 1971 to discuss the activities then being conducted on the property.

The plaintiff purchased the entire tract from Walsh in May of 1971.[6] As early as April 6, 1971, however, the plaintiff commenced the extensive earth removal operations which have given rise to the present dispute. He cleared the trees from approximately ninety acres of the tract and started the continuous removal of gravel from the Pembroke portion of the property, supposedly in preparation of the property for its development in accordance with the March plan. Between April 6 and October 14, 1971, the plaintiff removed from 350,000 to 375,000 cubic yards of gravel, which represented approximately twenty-five percent of the removable material and fifty percent of what the plaintiff ultimately intended to remove. The total area from which gravel had been removed at the time of the plaintiff's purchase was expanded by approximately twenty acres, and substantial changes were effected in the

[5] We do not know what, if any, zoning restrictions applied to the Marshfield portion of the property.

[6] The selectmen seem to have been personally unaware of the plaintiff or of his relationship to the property until the present proceedings were commenced on November 11, 1971. Walsh continued to hold a substantial mortgage on the property and to conduct all negotiations with the selectmen through the completion of the public hearing hereinafter referred to.

grades and contours shown as then existing on the March plan. Pudding Brook was damaged, or at least threatened, to the point that the Department of Natural Resources intervened. Aerial and other photographs taken at about the time of the cessation of work suggest the practical obliteration of Winter Street and portray a wasteland in the making, with noticeable areas of standing water. None of what was done was forbidden by the zoning or by any other by-law then in force in the town.

The actual removal of gravel was accomplished by means of heavy covered trucks, mostly tractor trailer units, which departed the property by a newly constructed access road, turned easterly on Oak Street through a district zoned for industrial purposes, proceeded thence by Oak Street and various other public ways approximately one quarter of a mile to the expressway in Marshfield, and thence to their destinations at construction projects in Boston. The removal operation continued on a more or less daily basis commencing between 4:30 to 5:30 A.M. and ending at 4:30 to 5:00 P.M. During the period from April to October, 1971, there were a total of some 28,000 truck movements into and out of the property. A simple calculation based on the number of trucks employed indicates that during working hours a truck either departed from or returned to the property at an average rate of one a minute. People living in homes located on Oak Street and on other public ways lying some four or five hundred feet to the westerly of the access road or of the actual excavation had been unreasonably disturbed by the noise generated by the operation of such trucks and of the equipment used to load them, particularly in the early hours of the morning.

By virtue of action taken at a special town meeting held in September the town adopted a comprehensive earth removal by-law which took effect on October 14, 1971.[7] We quote or summarize the provisions of the by-law which are

---

[7] By virtue of other action taken at the same town meeting the provisions of so much of the zoning by-law as had theretofore related to earth removal were "revoked."

Kelleher *v.* Board of Selectmen of Pembroke.

or may be material to this controversy. "All removal of soil, loam, sand, gravel or rock from land . . . is hereby prohibited unless done in strict compliance with a permit granted hereunder by the [b]oard of [s]electmen. Removal . . . shall mean stripping, digging or excavating the foregoing earth material from one lot and removing or carrying it away from said lot" (art. 12B A). All applications for permits are to be accompanied by exhibits, plans and other documentation which will portray or disclose the following items of information, among others: the proposed site of excavation; all property lines, vegetative cover, water courses and wet areas on the land involved, as well as existing topographic lines at five foot grade intervals carried one hundred feet beyond the limits of the proposed excavation; topographic lines at the same intervals after the proposed excavation is completed; estimated quantities of each substance to be removed, of the loam (and the depth thereof) presently located on the property, and of the amount of loam necessary to provide a four inch cover upon the termination of the removal work; explanation and assurances as to the availability of loam for that purpose; and an analysis and estimate of the amounts and types of grass, seed and plantings required to repair the site, and of the cost of performing such work (art. 12B C). If an application relates to the continuation of an existing removal operation, the selectmen may require a plan which will show all areas where past removal operations have been conducted. All permits issued by the board shall state all the conditions to be imposed, which may include, among others, conditions as to[8] finished level and sloping, the placement and seeding of loam and other plants, limits and duration of the removal operation, methods of removal and days and hours of operation, routes of transportation of material, control of temporary and permanent drainage, nonremoval of vegetation as screening, and (in the case of an application for continuance of an existing removal operation) corrective

---

[8] We mention here only those types of conditions with which the selectmen concerned themselves in the decision hereinafter discussed.

steps to be taken to restore areas of past removal operations (art. 12B D 15). No permit may be granted except after notice and public hearing, or for more than one year's duration (art. 12B E).

"No permit . . . shall be issued if such removal will: 1. Endanger the general public health, safety or convenience or constitute a nuisance. 2. Result in detriment to or depreciation of neighboring properties or interfere with owners or occupants of neighboring properties in the normal use and enjoyment of their properties by reason of noise, dust, vibrations, traffic or drainage conditions. 3. Extend within three hundred (300) feet of a public way, . . . nor if there is insufficient vegetative barrier to remain on the property after excavation as proposed to prevent view of the area from a way. This provision may be waived by the . . . [board] if said removal operation will result in said site being left at approximate level or grade of adjacent way" (art. 12B E). The board is given the "right to exempt . . . from any or all of the requirements of this by-law" operations consisting of less than five hundred cubic yards, operations in assistance of the cultivation of cranberry bogs, and "[e]xisting removal operations so long as the quantity of earth materials proposed to be removed is consistent with the past use and extent of said existing removal operation" (art. 12B I). The by-law concludes with penal provisions for the violation thereof (art. 12B K).

Immediately following the effective date of the by-law the selectmen caused the police to stop trucks leaving the plaintiff's property. By vote of the selectmen on October 18, 1971, Walsh and other earth removal operators were given some form of "temporary permit" to continue their operations pending hearings on applications under the by-law.[9] Walsh promptly made application in writing to the selectmen for a permit,[10] and a public hearing on that application

---

[9] The others to whom similar permits were given were described as "very small two and three truck operations" who or which have apparently been allowed to continue their operations "until this case is over."

[10] The application is not before us, and we do not know whether it was intended

was held by the board on November 8, 1971. Except for a copy of the March plan (previously described) and certain models which were brought to the court room but which are not in evidence, and except as we know from certain photographs in evidence some of what the selectmen saw on a view taken in company with the plaintiff on November 21, 1971, all we know of the evidence which was submitted to the board with the application or at the public hearing is what appears from the face of the ensuing decision of the board.[11] It is inferable from the board's decision that a great deal of the information required by art. 12B C of the by-law was never supplied by Walsh, who represented the plaintiff at the public hearing. Following an abortive attempt by the plaintiff to secure injunctive relief against the selectmen by his original bill in equity (likewise not before us) the board, on November 22, 1971, denied the plaintiff's application by a lengthy written decision which specifically provided that it was made without prejudice to the plaintiff's submitting a new application filed in accordance with the contents of the decision.

We have that decision before us, as well as extensive testimony by the chairman of the selectmen as to the matters considered by the board and the reasons for its decision, including certain considerations and reasons not appearing on the face of the written decision.[12] The decision

as an application for a permit under the provisions of art. 12B, C through E, or as an application for a total exemption under art. 12B I.

[11] The trial judge, at the insistence of the plaintiff, excluded questions put by town counsel to the chairman of the selectmen which were designed to elicit information as to the evidence introduced at the hearing before the selectmen. One who is really desirous of attacking the reasonableness of the action of a board under the circumstances prevailing in this case may have such evidence brought before the court by an extension of the return to a petition for a writ of certiorari. See *Butler* v. *East Bridgewater,* 330 Mass. 33, 39; *Boston Edison Co.* v. *Selectmen of Concord,* 355 Mass. 79, 81, 82-87, 92-93. The plaintiff in the present case shut himself off from that particular avenue of review by bringing suit against the selectmen before they had rendered any decision on his pending application.

[12] The chairman was the only member of the board called by the plaintiff, whose counsel was allowed great latitude in engaging in argumentative dialogue with the witness. In some instances the answer appeared to be personal to the witness, while in others the answer appeared to reflect the thinking of the entire board. In either event, the testimony so elicited was the evidence most favorable to the plaintiff on the issue whether the board had acted in an arbitrary or capricious manner in denying the plaintiff's application.

and the testimony, for the most part, display a responsible desire on the part of the board to regulate the plaintiff's future earth removal operations with foresight based on known data or reliable estimates and an unwillingness to grant a permit until satisfied of the manner in which the plaintiff proposed to fulfill conditions of the type the board is authorized to impose under art. 12B D of the by-law. However, as the board did consider certain matters which are not proper for consideration under an earth removal by-law, and as the plaintiff may choose to make further application for a permit, we shall divide our discussion of the board's action into two parts. We approach our entire discussion, however, in the light of the rule that it was the selectmen's "duty to act in a fair, judicial and reasonable manner upon the evidence as presented to them, keeping in mind the objects of the by-law. They could not act in an unreasonable, arbitrary, whimsical, or capricious manner." *Butler* v. *East Bridgewater,* 330 Mass. 33, 38.

The board noted that some 350,000 cubic yards of material had been removed since the effective date of the March plan and insisted on the preparation of a currently accurate plan which would show the present and proposed contours with respect to the proposed excavation site and adjacent areas. The board noted that the March plan did not contain the location of Winter Street (through which the plaintiff proposed to excavate), said that it had no authority to abandon or relocate a public way without authority from a town meeting, and insisted upon a plan which would show the present location of Winter Street and how the plaintiff proposed to excavate in its vicinity without affecting it. The board specifically pointed out other deficiencies in the plaintiff's presentation, including lack of any evidence of the availability to the plaintiff of the 16,000 cubic yards of loam which Walsh had admitted would be needed to cover the proposed excavation site after completion of the work, and lack of sufficient data to insure that Pudding Brook, its vegetation and wildlife, would not be adversely affected by silting and surface runoff. The board remarked that the proposed excavation would ex-

tend to within three hundred feet of Oak and Winter Streets.[13] It is quite obvious, both from the decision and from the evidence at trial, that one of the board's principal concerns was with the fact, apparently supported by ample evidence at the public hearing and corroborated at trial, that neighboring residents had in the past been unreasonably disturbed "in the normal use and enjoyment of their homes and properties by reason of excessive and continuous noise, dust [and] vibrations." The board specifically found that the plaintiff's "removal operation to date has ... constituted a nuisance in the area and will necessarily constitute a nuisance ... if allowed to continue at the same level of operation as requested ... [and] will necessarily result in depreciation of neighboring properties and substantial interference with neighboring residents in the normal use and enjoyment of their properties." In our opinion the foregoing matters were legitimate ones for consideration by the board in deciding whether to grant or deny a permit for earth removal under a by-law such as art. 12B and warranted the board's action in denying the plaintiff's application for a permit. See *Wilbur* v. *Newton,* 302 Mass. 38, 42; *Burlington* v. *Dunn,* 318 Mass. 216, 221, cert. den. sub nom. *Dunn* v. *Burlington,* 326 U. S. 739; *Wayland* v. *Lee,* 325 Mass. 637, 642; *Stow* v. *Marinelli,* 352 Mass. 738, 742; *Glacier Sand & Stone Co. Inc.* v. *Board of Appeals of Westwood,* 362 Mass. 239, 240-241.

Although the board could legitimately consider the noise, dust and vibration effects of truck traffic on the value and enjoyment of neighboring properties, it could not properly consider, or base its denial of the application on a likelihood, that truck traffic would create or continue a traffic hazard on Oak Street. *Stow* v. *Marinelli,* 352 Mass. 738, 742. *Goodwin* v. *Selectmen of Hopkinton,* 358 Mass. 164, 167-168. *Glacier Sand & Stone Co. Inc.* v. *Board of Appeals of Westwood,* 362 Mass. 239, 240-241. The board

---

[13] We express no opinion on the question whether the board could properly have concerned itself with the visibility of the excavation site from the portion of the expressway lying in Marshfield. We assume it will not do so at any future hearing.

should not have concerned itself with the possible destruction of the value of that portion of the plaintiff's own property zoned for residential uses and lying along the westerly boundary of the tract; the plaintiff had the right to sacrifice the value of a portion of his land for what he thought was the greater value of the whole. The board, under an earth removal by-law, should not have considered the suitability of the soil for sanitary disposal and drainage systems in the area and at the grades intended by the plaintiff for the construction of industrial buildings; such was matter for later consideration by the planning board and the board of health under G. L. c. 41, § 81M, as most recently amended by St. 1969, c. 884, § 2. See *Daley Construction Co. Inc.* v. *Planning Board of Randolph,* 340 Mass. 149, 152-155; *Caruso* v. *Planning Board of Revere,* 354 Mass. 569. Nor do we think the board had the right, despite the language of art. 12B D 15 of the by-law, to concern itself with, or to attempt to impose any condition with respect to, the loaming and reseeding of areas already disturbed by the plaintiff prior to the effective date of the by-law but lying outside the area of proposed further excavation; to condition the grant of a permit upon the restoration of the area already cleared and stripped would be retroactively to penalize the plaintiff for acts which were lawful when done. See the *Butler* case (330 Mass. at 39-40). There is nothing in the evidence to suggest that any of the foregoing misapplications of the law was intentional or resulted from anything other than honest mistake. As the board's denial of the plaintiff's application for a permit was justified by the considerations discussed in the preceding paragraph of this opinion, we do not believe these mistakes require us to invalidate the board's decision. We have discussed them at such length only to avoid their repetition in the course of the board's consideration of any future application the plaintiff may file.

It should be apparent from what has already been said that we see nothing "unreasonable, arbitrary, whimsical, or capricious" in the board's actions or decision within the meaning of the rule stated in the *Butler* case (330 Mass. at

38). The selectmen having for valid reasons exercised their right not to exempt the plaintiff's existing operation (art. 12B I of the by-law) and to treat the plaintiff's application as one for a permit (fn. 10 this opinion), the only remaining question is whether the regulatory provisions of this particular by-law may be constitutionally applied to the plaintiff. It is doubtful whether the plaintiff's argument on this point amounts to anything more than a demonstration that none of the decided cases involving earth removal by-laws (fn.3) has squarely upheld the application of a new such by-law to an existing operation. The plaintiff has tempered his original allegations (first paragraph of this opinion) by conceding in his brief that his business may be subjected to "reasonable regulations concerning loam and seed, dust and noise as a pre-existing use." We believe such concession to be required by the cases decided under the zoning enabling act to the effect that a newly adopted zoning by-law may constitutionally impose reasonable regulations on the conduct and expansion of an existing earth removal operation. See *Burlington* v. *Dunn,* 318 Mass. 216, 220-223, cert. den. sub nom. *Dunn* v. *Burlington,* 326 U. S. 739; *Billerica* v. *Quinn,* 320 Mass. 687, 688-690; *Seekonk* v. *John J. McHale & Sons, Inc.* 325 Mass. 271, 273-274; *Massachusetts Broken Stone Co.* v. *Weston,* 346 Mass. 657, 659-661.[14] A town has "the option to proceed under the zoning enabling act or under G. L. c. 40, § 21(17), in adopting . . . by-laws to regulate the removal of material from land" (*Goodwin* v. *Selectmen of Hopkinton,* 358 Mass. 164, 170), and the principles established in determining the validity of the application of a zoning by-law should apply with equal force to an earth removal by-law. Except in the one respect already noted (art. 12D B 15), we are of opinion that the regulatory provisions of the by-law

[14] Other cases involving the application of zoning by-laws to earth removal operations which have not already been cited include the following: *Lexington* v. *Menotomy Trust Co.* 304 Mass. 283, 284; *Saugus* v. *B. Perini & Sons, Inc.* 305 Mass. 403, 406-407; *Raimondo* v. *Board of Appeals of Bedford,* 331 Mass. 228; *Lexington* v. *Simeone,* 334 Mass. 127, 131. In the case last cited it was said, "There is no constitutional right to convert wild land into waste land" (p. 130).

which have been summarized are reasonable, that they provide adequate standards for the guidance of the board, and that they may be constitutionally applied to this plaintiff's existing earth removal operation.

*Final decree affirmed.*