NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

15-P-331                                         Appeals Court

NEW ENGLAND SURVEY SYSTEMS, INC. vs. DEPARTMENT OF INDUSTRIAL ACCIDENTS.

No. 15-P-331.

Suffolk.     December 8, 2015. - June 30, 2016.

Present: Grainger, Hanlon, & Agnes, JJ.

Workers' Compensation Act, Failure to obtain insurance, Cancellation of insurance. Department of Industrial Accidents. Statute, Construction. Due Process of Law, Administrative hearing. Administrative Law, Judicial review.

Civil action commenced in the Superior Court Department on April 26, 2013.

The case was heard by Frances A. McIntyre, J., on a motion for judgment on the pleadings.

Timothy K. Cutler for the plaintiff.
Douglas S. Martland, Assistant Attorney General, for Department of Industrial Accidents.

AGNES, J. The Workers' Compensation Act, G. L. c. 152 (act), provides that whenever the Commissioner of the Department of Industrial Accidents (the department) determines that an

employer has not provided the insurance required by law,[1] "a stop work order shall be served on said employer, requiring the cessation of all business operations at the place of employment or job site."  G. L. c. 152, § 25C(1), as amended through St. 1989, c. 341, § 82.  The stop work order takes effect upon service on the employer, and remains in effect until the employer satisfies the commissioner that it has obtained the required insurance and paid the $100 per day civil penalty for each day it was in violation of the law, beginning with the date of service of the order.  § 25C(1) of the act.  Section 25C also provides for additional civil and criminal penalties against employers who do not obtain the insurance required by law.  See G. L. c. 152, § 25C(5)-(6), (9)-(11).  Subsection (10) of § 25C sets forth one of the additional civil penalties that an employer who fails to obtain the insurance required by the act may face.  It reads as follows:

> "(10) In addition to being subject to the civil penalties herein provided, an employer who fails to provide for insurance or self insurance as required by this chapter or knowingly misclassifies employees, to avoid higher premium rates, will be immediately debarred from bidding or participating in any state or municipal funded contracts for a period of three years and shall when applicable be subject to penalties provided for in section fourteen" (emphasis supplied).[2]

----

[1] See G. L. c. 152, § 25A.

[2] Subsection (10) was added to § 25C as part of the Legislature's 1991 reforms of the act.  St. 1991, c. 398, § 45B.

The issue before us, which is one of first impression, is whether the phrase "to avoid higher premium rates," as it appears in subsection (10), modifies the two preceding clauses ("who fails to provide for insurance or self insurance as required by this chapter or knowingly misclassifies employees") or modifies only the immediately preceding clause ("knowingly misclassifies employees").

The plaintiff, New England Survey Systems, Inc. (NESS), contends that the placement of the comma after the word "employees" means that the phrase "to avoid higher premium rates," modifies the two preceding clauses with the effect that an employer like NESS -- against whom a stop work order issued due to its failure to have the insurance required by law, but who was not shown to have acted with the intent to avoid higher insurance premiums -- is not subject to automatic debarment. In essence, NESS claims that prior to implementing the penalty of debarment, the department was required to prove that NESS's admitted failure to provide insurance was motivated by a desire to avoid higher premium rates. The department, on the other hand, asserts that under § 25C(10), debarment occurs whenever a stop work order issues against an employer who failed to obtain or provide the required insurance, regardless of the employer's intent or motivation. While we agree with NESS that the penalty

of debarment for three years is a severe sanction, we do not agree with its reading of subsection (10). Instead, we conclude that the words used by the Legislature express its intention that the debarment provision contained in subsection (10) applies when an employer fails to obtain or provide workers' compensation insurance, without the need to establish that this was the result of the employer's intent to avoid higher insurance premiums. Accordingly, we affirm the ruling made by the Superior Court judge which, in turn, is consistent with the interpretation followed by the department.[3]

Background. Stop work order and debarment. On December 28, 2012, an investigator with the department was working in the Brookline area and came upon NESS's place of business. The investigator queried the Workers' Compensation Rating and Inspection Bureau's computer system and discovered that NESS had a canceled workers' compensation insurance policy. The

---

[3] Based on the view we take that G. L. c. 152, § 25C(10), requires the penalty of debarment for three years to take effect in the event a stop work order issues, it is unnecessary to consider the evidence offered by NESS that its workers' compensation insurance policy lapsed when its insurance broker failed to notify NESS that it was time to renew the policy, and other evidence about the economic consequences that debarment will have on its business and its employees. It should be noted that an insurer providing voluntary workers' compensation insurance is required to serve notice upon the insured in accordance with G. L. c. 175, § 187C, before it may cancel the policy. See Pillman's Case, 69 Mass. App. Ct. 178, 181 & n.6 (2007).

investigator issued NESS a stop work order pursuant to G. L. c. 152, § 25C.  NESS's president, John Roberge, who maintained he was unaware that the policy had lapsed, contacted its insurance provider that day, and the provider reinstated coverage immediately.[4]  The department nevertheless maintained that debarment was automatic and nondiscretionary under § 25C(10).

Appeal history.  NESS filed an administrative appeal from the debarment order.[5]  The department held an appeal hearing on January 16, 2013, and issued a written decision upholding the stop work order and debarment penalty on March 29, 2013.  NESS filed a further appeal in the Superior Court under G. L. c. 30A, § 14.  NESS moved for judgment on the pleadings, and the department filed an opposition.  On July 15, 2014, after

---

[4] Based on the reading of the statute by the department as well as the Superior Court, and the view we take, the reason why NESS's policy of insurance was cancelled is not relevant.  NESS does not deny that it lacked insurance coverage between April 9, 2012, and December 28, 2012.  Although NESS acted promptly and obtained workers' compensation insurance coverage the same day the stop work order was issued, there is no evidence in the record that its policy provided retroactive coverage for the more than eight-month period during which NESS's workers' compensation insurance policy remained lapsed.

[5] NESS first filed an appeal of the stop work order, withdrew the appeal request, and then withdrew the request for withdrawal.  In any case, the appeal proceeded with a hearing, and a final agency decision issued upholding both the stop work order and the debarment.  Before us, NESS apparently challenges only the penalty of debarment and not the initial stop work order.

hearing, a Superior Court judge issued a memorandum and order affirming the department's decision. Judgment entered for the department on October 20, 2014, and this appeal followed.

Discussion. a. Applicable principles of interpretation. The interpretation of § 25C(10) is a matter of law, and we exercise de novo review of the department's interpretation of that statute. See Protective Life Ins. Co. v. Sullivan, 425 Mass. 615, 618 (1997). The words used by the Legislature in a statute, viewed in their statutory context and in the light of the purpose of the legislation, are the best guide to legislative intent. See Hanlon v. Rollins, 286 Mass. 444, 447 (1934); Hoffman v. Howmedica, Inc., 373 Mass. 32, 37 (1977); Bronstein v. Prudential Ins. Co. of America, 390 Mass. 701, 704 (1984). This is in keeping with guidance from the Legislature on how statutes should be interpreted. See   G. L. c. 4, § 6, Third, set out in the margin.[6] When statutory language yields a plain meaning, arguments that its application in a particular case will cause a hardship or lead to an inequity should be

---

[6] General Laws c. 4, § 6, Third, provides:

"Words and phrases shall be construed according to the common and approved usage of the language; but technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in law shall be construed and understood according to such meaning."

addressed to the Legislature.  See <u>Larkin</u> v. <u>Charlestown Sav.</u>
<u>Bank</u>, 7 Mass. App. Ct. 178, 183-184 & n.9 (1979).

The Superior Court judge recognized that the interpretation
of § 25C(10) urged by NESS was illogical in that an employer who
is not self-insured and has not provided workers' compensation
insurance coverage, and therefore has paid <u>no</u> insurance premium,
would avoid the penalty of debarment, while an employer who did
have insurance, but misclassified one or more employees in order
to pay a lower insurance premium, would face the penalty of
debarment.[7]  The natural and logical reading of the words used by
the Legislature in § 25C(10) is that an employer whose employees
are not covered by workers' compensation insurance and who is
not self-insured is subject to automatic debarment.  A
consideration of the purpose and intent of the Legislature in
enacting G. L. c. 152, and in particular, the amendments adopted
in 1991, buttresses this interpretation of § 25C(10).  See
<u>Lighthouse Masonry, Inc</u>. v. <u>Division of Administrative Law</u>
<u>Appeals</u>, 466 Mass. 692, 701 n.17 (2013).

b.  <u>The Workers' Compensation Act and the 1987-1991</u>
<u>reforms</u>.  General Laws c. 152, enacted in 1911, was initially an
"elective" law that allowed employers in the Commonwealth to opt

---

[7] The judge's view is shared by the department.  See
<u>Protective Life Ins. Co</u>. v. <u>Sullivan</u>, 425 Mass. at 618 ("[W]e
grant substantial deference to an interpretation of a statute by
the administrative agency charged with its administration").

into its provisions by securing insurance to cover workplace injuries incurred by employees.  St. 1911, c. 751.  Its provisions were made compulsory for most employers in 1943, see St. 1943, c. 529, and remain so today.[8]  Our courts have long recognized that the act is a "humanitarian measure" designed to financially protect injured workers by providing remedies more expansive and predictable than those available via tort at common law.  See LaClair v. Silberline Mfg. Co., 379 Mass. 21, 27 (1979).  "It is a remedial statute and should be given a broad interpretation, viewed in light of its purpose and to 'promote the accomplishment of its beneficent design.'"  Neff v. Commissioner of the Dept. of Industrial Accs., 421 Mass. 70, 73 (1995), quoting from Young v. Duncan, 218 Mass. 346, 349 (1914).  The fundamental aim of public policy in the area of workers' compensation is to provide relief to injured workers and their families and remedy the deprivation of wages that results from their injuries.[9]

---

[8] "Certain workers are not defined as employees for the purposes of the . . . [a]ct.  See G. L. c. 152, § 1(4).  Special provisions also apply to public employers.  See G. L. c. 152, §§ 25B, 69-75."  Awuah v. Coverall N. America, Inc., 460 Mass. 484, 494 n.21 (2011).  NESS makes no argument that it is not required to provide workers' compensation coverage for its employees.

[9] See Nason, Koziol & Wall, Workers' Compensation § 2.12, at 48 (3d ed. 2003) ("Amendments to the Workers' Compensation Act should be broadly construed to enlarge the rights of employees and liberalize its interpretation").  The Supreme Judicial Court has noted that a broad interpretation of the act is of the

Section 25C of the act, which provides for the sanctions levied against the employer in this case, was adopted in 1943, when the provisions of the act went from optional to compulsory for most employers.  See St. 1943, c. 529, § 7.  To enforce the compulsory insurance requirement, § 25C at first provided for punishment of an employer by a fine up to $500, or by imprisonment for up to one year, or both for its failure to provide the same.[10]

The act saw substantial changes in 1985, following hearings conducted by a Governor's Task Force convened to address problems with the funding, administration, and scope of the workers' compensation system.  See St. 1985, c. 572; St. 1986, c. 662; St. 1987, c. 691.  Changes were made to the department's infrastructure and funding, along with benefit entitlements and procedural rules.[11]  In 1987, the sanction was enhanced substantially by St. 1987, c. 691, § 10, which gave the department the power to issue a stop work order requiring a

---

utmost importance, because the act's exclusivity provision replaces an employee's ability to seek relief through common-law tort actions.  Walker's Case, 443 Mass. 157, 161 (2004), S.C., 453 Mass. 358 (2009).

[10] See St. 1951, c. 689; St. 1953, c. 330.

[11] See Nason, Koziol & Wall, Workers' Compensation § 2.6 (3d ed. 2003) (highlighting 1985 reforms).  Relevant here, in 1986 the § 25C fine for failure to provide workers' compensation insurance was tripled, from $500 to $1,500.  St. 1986, c. 662, § 20.

noncomplying employer to immediately cease operations.  G. L. c. 152, § 25C(1)-(4).

The 1985 reforms were not effective in controlling the costs of workers' compensation insurance premiums, and rates continued to rise sharply in the years to follow.  Nason, Koziol & Wall, Workers' Compensation § 2.8 (3d ed. 2003).  These ongoing concerns culminated in an even more comprehensive wave of reform and the passage in 1991 of "An Act Relative to Fair and Effective Compensation of Injured Workers," St. 1991, c. 398.  The reforms enacted in 1991 "acknowledged the premise that workplace injuries were a factor in the costs of doing business, and recognized that this cost factor had to be reduced in order to stimulate business growth and employment opportunities within the Commonwealth."  Nason, Koziol & Wall, Workers' Compensation § 2.8, at 35 (3d ed. 2003).  During the years leading up to the 1991 reforms, annual reports of the Workers' Compensation Advisory Council noted concern over the number of employers within the Commonwealth operating illegally without workers' compensation insurance.  In fiscal year 1988, the Advisory Council recommended revising the act's enforcement provisions to strengthen sanctions against uninsured employers.[12]

---

[12] Workers' Compensation Advisory Council, Fiscal Year 1988 Annual Report 11-12, http://www.mass.gov/lwd/docs/wcac/annual-reports/ar-1988-v1.pdf [https://perma.cc/L35X-4C5C].

Its 1990 report noted that such "system abuse" increases costs for law-abiding employers.[13] In 1991 testimony before the Legislature's Joint Commerce and Labor Committee, Joseph Faherty, chairman of the Advisory Council, attested to the need for legislative reform to curtail this sort of abuse in order to cut costs of workers' compensation and keep the State competitive: "We fear that a failure to implement fair insurance rates will encourage more business entities to unlawfully operate without insurance and further erode the commonwealth's competitive edge. The livelihoods of employers and employees depend on the ability to bring insurance costs under control."[14,15]

As part of the 1991 reforms, the Legislature added subsection (10) to G. L. c. 152, § 25C, which provides that noncompliant employers "will be immediately debarred from

---

[13] Workers' Compensation Advisory Council, Fiscal Year 1990 Annual Report 69, http://www.mass.gov/lwd/docs/wcac/annual-reports/ar-1990.pdf [https://perma.cc/3WY4-GYSL].

[14] Workers' Compensation Advisory Council, Fiscal Year 1992 Annual Report Appendix G, http://www.mass.gov/lwd/docs/wcac/annual-reports/ar-1992.pdf [https://perma.cc/KV9J-QD55].

[15] That same year, the Advisory Council also suggested that the department consider publicizing a list of employers to whom stop work orders had been issued in an effort to reduce noncompliance with the act. Workers' Compensation Advisory Council, Fiscal Year 1991 Annual Report 113, http://www.mass.gov/lwd/docs/wcac/annual-reports/ar-1991.pdf [https://perma.cc/AG8W-GQNE].

bidding or participating in any state or municipal funded contracts for a period of three years[.]"  St. 1991, c. 398, § 45B.  This enforcement mechanism was provided in addition to the fines, stop work orders, and other penalties that already existed in § 25C(1)-(8) of the act.  The only question before us is whether the penalty of debarment is automatic in the case of a failure to comply with § 25C(10).  Given the principle that the act is to be interpreted broadly for the protection of workers, and in view of the historical development of c. 152, especially the evidence that the 1985 reforms were not as successful in reducing the cost of insurance as had been hoped, we conclude the Legislature intended that the words it used in St. 1991 in drafting subsection (10) should be given their natural meaning such that an employer is subject to the penalty of debarment once a stop work order has issued for failure to provide insurance coverage.[16]

---

[16] The Workers' Compensation Advisory Council, in annual reports between 1996 and 2002, repeatedly noted its concern that the stop work order penalty and fines were "not sufficiently punitive to deter employers from violating the mandate [to provide insurance coverage.]"  Workers Compensation Advisory Council, Fiscal Year 1996 Annual Report 121, http://www.mass.gov/lwd/docs/wcac/annual-reports/ar-1996.pdf [https://perma.cc/HWC5-C6TJ]; Fiscal Year 1997 Annual Report 7, http://www.mass.gov/lwd/docs/wcac/annual-reports/ar-1997.pdf [https://perma.cc/AAN7-UGJR]; Fiscal Year 1998 Annual Report 10, http://www.mass.gov/lwd/docs/wcac/annual-reports/ar-1998.pdf [https://perma.cc/KL4W-TV3H]; Fiscal Year 1999 Annual Report 9, http://www.mass.gov/lwd/docs/wcac/annual-reports/ar-1999.pdf [https://perma.cc/JF6P-L4F6]; Fiscal Year 2000 Annual Report 10,

The legislative history recounted above strongly suggests that the Legislature added the penalty of debarment to the statutory sanctions for noncompliance with the insurance requirements of the act in an effort to compel employers to comply with their obligations.  NESS argues that the placement of a single comma in the statute is outcome-determinative based on an interpretive aid known as the "last antecedent" rule.[17]  We disagree.  First, when the words used by the Legislature have a plain meaning and achieve a logical and workable result, we do not turn to extrinsic interpretive aids such as legislative history, dictionaries, or grammatical guidelines.  See, e.g., Foss v. Commonwealth, 437 Mass. 584, 587 (2002).  Second, when the intent of the Legislature is not evident based solely on the words of a statute, extrinsic aids may be helpful but they do

---

http://www.mass.gov/lwd/docs/wcac/annual-reports/ar-2000.pdf [https://perma.cc/5UTA-TRQ9]; Fiscal Year 2001 Annual Report 9, http://www.mass.gov/lwd/docs/wcac/annual-reports/ar-2001.pdf [https://perma.cc/GDT6-Q99A]; Fiscal Year 2002 Annual Report 11, http://www.mass.gov/lwd/docs/wcac/annual-reports/ar-2002.pdf [https://perma.cc/Y3SK-DZA5].

[17] The last antecedent rule provides first that a modifying clause is confined to the phrase that immediately precedes it and not to the phrases appearing earlier. Hopkins v. Hopkins, 287 Mass. 542, 547 (1934).  However, a comma separating the modifying clause from its antecedent(s) is some evidence that the modifier is meant to apply to all the antecedents, instead of only the immediate antecedent. Bednark v. Catania Hospitality Group, Inc., 78 Mass. App. Ct. 806, 813 n.17 (2011). See 2A Singer & Singer, Sutherland Statutory Construction § 47:33 (7th ed. rev. 2014).

not supply hard and fast rules.  The last antecedent rule is not always a certain guide.  See, e.g., Selectmen of Topsfield v. State Racing Commn., 324 Mass. 309, 312 (1949); Globe Newspaper Co. v. Boston Retirement Bd., 388 Mass. 427, 432 (1983).[18]  In particular, we do not apply the last antecedent rule when "there is something in the subject matter or dominant purpose [of the statute] which requires a different interpretation."  Hopkins v. Hopkins, 287 Mass. 542, 547 (1934), and cases cited.

c.  Consideration of the act as a whole.  "The legislative intent is to be ascertained from the statute as a whole, giving to every section, clause and word such force and effect as are reasonably practical to the end that . . . the statute will constitute a consistent and harmonious whole, capable of producing a rational result consonant with common sense and sound judgment."  Vining Disposal Serv. v. Board of Selectmen of Westford, 416 Mass. 35, 38 (1993), quoting from Haines v. Town Manager of Mansfield, 320 Mass. 140, 142 (1946).

Of relevance here, § 25C(9)(a) of the act was inserted by the same amendment that inserted § 25C(10), see St. 1991,

---

[18] See also DiFiore v. American Airlines, Inc., 454 Mass. 486, 495-496 (2009), and cases cited ("[W]e do not adopt a statutory interpretation derived from an analysis of punctuation that conflicts with principles of statutory construction").  See generally Llewellyn, Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are to be Construed, 3 Vand. L. Rev. 395 (1949-1950).

c. 398, §§ 45A and 45B, and should be interpreted in harmony with § 25C(10).  Section 25C(9)(a) creates a cause of action for a losing contract bidder against a person who is awarded a public contract by competitive bid "because of cost advantages achieved by violating the provisions of section twenty-five A or section twenty-five C of this chapter or by the deliberate misclassification of employees for the purpose of avoiding full payment of workers' compensation insurance premiums" (emphasis supplied).  Subsection (9)(a) thus permits a civil action to be brought against a person who obtains a public contract dishonestly by either (1) violating § 25A or § 25C; or (2) deliberately misclassifying employees in order to avoid full payment of premiums.  This supports the view that the debarment penalty in § 25C(10) was similarly meant to punish either the failure to provide insurance or the misclassification of employees to avoid higher insurance premiums.  In both subsections (9)(a) and (10), only the misclassification prong requires that the action of the employer was undertaken to further the goal of avoiding payment of higher premiums.

Citing Awuah v. Coverall N. America, Inc., 460 Mass. 484, 495 (2011), NESS argues, in effect, that the distinction drawn by the Legislature in § 25C(10) is artificial because an employer who misclassifies an employee fails to pay the required premium no less than the employer who fails to pay any insurance

premium at all.  However, we note that the passage in Awuah

cited by NESS cites to language in G. L. c. 152, § 14(3), which

is consistent with our reading of § 25C(10) of the act.  That

language provides, in pertinent part, that an "employer who

knowingly misclassifies employees . . . for the purpose of

avoiding full payment of insurance premiums . . . shall be

punished" (emphasis supplied).  G. L. c. 152, § 14(3), inserted

by St. 1991, c. 398, § 38.  Moreover, it is not inconsistent

with the court's analysis in Awuah to conclude, as we do in this

case, that in enacting § 25C(10), the Legislature recognized a

distinction between the misclassification of an employee, which

may or may not be done with an intent to lower the employer's

premium rate, and the simple failure to provide any insurance,

even if no misclassification has occurred.  In essence, it is a

simple matter to establish whether an employer does or does not

have insurance coverage for its employees.  In contrast, where

there is a misclassification of employees (which could be

deliberate, or the result of mistake or inadvertence), in order

to be fair to the employer, punishment should not be imposed

unless it is first determined that the misclassification was

both knowing and done with the intention of avoiding higher

insurance premiums.

In sum, we hold that the penalty of debarment is triggered

automatically in a case such as this, without the need to

establish that the employer acted intentionally or wilfully, or that the employer sought to avoid payment of higher insurance premium rates.  This result is consistent with the act's purpose, legislative history, closely related provisions, and its plain language.[19]

d.  Remaining arguments.  NESS also contends that G. L. c. 152, § 25C(10), as applied, violates its constitutional rights to due process of law under the Constitution of the United States and the Massachusetts Constitution because it does not afford the employer an opportunity to present evidence that the cancellation of its insurance policy was not the result of intentional conduct.  "The fundamental requirement of due process is notice and the opportunity to be heard 'at a meaningful time and in a meaningful manner.'"  Matter of Angela, 445 Mass. 55, 62 (2005), quoting from Armstrong v. Manzo, 380 U.S. 545, 552 (1965).  The record indicates that NESS was not only aware that it was subject to a fine as a result of the stop work order, but it was also aware that it was debarred from bidding on or participating in any State or municipal contract

_____

[19] The Legislature has established a separate and distinct system for the debarment of certain contractors from participating in bidding on public construction contracts. G. L. c. 29, § 29F.  See Fordyce v. Hanover, 457 Mass. 248, 261 (2010).  The fact that the debarment of contractors is a matter of discretion under § 29F, a provision addressing an entirely different problem, has no bearing on the questions before us.

for a period of three years.  NESS was given an opportunity to challenge the validity of the stop work order at an evidentiary hearing.  NESS participated in that hearing and submitted evidence.  NESS's reliance on Old Dominion Dairy Prods., Inc. v. Secretary of Defense, 631 F.2d 953 (D.C. Cir. 1980), is misplaced because the result in Old Dominion turned on the government's failure to disclose to a contract bidder in a timely manner an adverse determination that the bidder lacked integrity, which resulted in the contractor losing a bid before it had an opportunity to dispute the adverse determination.  In the present case, the only factual predicate to the imposition of the penalty of debarment was the validity of the stop work order, which NESS does not contest.[20]

---

[20] We do not address an alternative argument, raised by NESS for the first time on appeal to the Superior Court, that G. L. c. 152, § 25C(10), is unconstitutional because the remedy of debarment affects only employers who bid on public contracts, thus depriving NESS of the equal protection of the laws.  See Albert v. Municipal Ct. of Boston, 388 Mass. 491, 493 (1983) ("A party is not entitled to raise arguments on appeal that [it] could have raised, but did not raise, before the administrative agency").  Cf. Gill v. Board of Registration of Psychologists, 399 Mass. 724, 727 (1987) (in the interest of preserving the integrity of the administrative and judicial processes, the court declined to consider issue raised on appeal concerning administrative board's jurisdiction where the board had not had the opportunity to address it).

We also note that NESS's reliance on In re Environmental Source Corp., 431 B.R. 315 (Bankr. D. Mass. 2010) is misplaced. There, the Bankruptcy Court limited its constitutional analysis to the preemption issue that arose when a contractor, whose business involved public sector contracting, failed to pay a

e.  Chapter 30A review.  This court, like the Superior Court, reviews the department's decision "according to the standards set forth in G. L. c. 30A, § 14(7), giving 'due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.'"  Athol Daily News v. Board of Review of the Div. of Employment & Training, 439 Mass. 171, 174 (2003).  We may set aside the department's decision only if it is unsupported by substantial evidence, is arbitrary or capricious, constitutes an abuse of discretion, or is not in accordance with law.  G. L. c. 30A, § 14(7)(a)-(g).  See, e.g., Coverall N. America, Inc. v. Commissioner of the Div. of Unemployment Assistance, 447 Mass. 852, 857 (2006).

NESS makes no argument that it did not, in fact, fail to maintain workers' compensation insurance for a period of eight months.  The lack of coverage is undisputed on this record.  Because we hold that the department was not required to prove

---

prebankruptcy petition debt (namely, its workers' compensation insurance premium) and was debarred.  Debarment prevented the business from earning income that would allow it to emerge from bankruptcy.  The court reasoned that to apply § 25C(10) in such a case would violate the supremacy clause of the United States Constitution, Art. VI, because it interfered with the purpose and policy of Chapter 11 of the Bankruptcy Code, which "include[s] the preservation and rehabilitation of financially distressed businesses."  431 B.R. at 322.  Insofar as Environmental Source Corp. turns on the disproportionate impact of § 25C(10) on businesses that operate in the public sector, its reasoning is limited to the circumstances of a debtor in bankruptcy.

anything more than the fact that NESS lacked coverage and that a stop work order was issued, and NESS does not contend that the department failed to do so, there is no basis to disturb the department's decision.

Judgment affirmed.