SUPREME JUDICIAL COURT 
 
 COMMONWEALTH vs. PHILIP J. MARQUIS

 
 Docket:
 SJC-13562
 
 
 Dates:
 September 9, 2024 – March 11, 2025
 
 
 Present:
 Budd, C.J., Gaziano, Kafker, Wendlandt, Georges, & Wolohojian, JJ.
 
 
 County:
 Middlesex
 

 
 Keywords:
 Firearms. License. Constitutional Law, Right to bear arms, Equal protection of laws, Right to travel, Standing. Practice, Criminal, Standing. Statute, Construction. Words, "Shall be issued," "Determined unsuitable."
 
 

             Complaint received and sworn to in the Lowell Division of the District Court Department on October 12, 2022.
            A motion to dismiss was heard by John F. Coffey, J., and a motion for reconsideration was considered by him.
            The Supreme Judicial Court granted an application for direct appellate review.
            Ryan J. Rall, Assistant District Attorney, for the Commonwealth.
            K. Hayne Barnwell for the defendant.
            The following submitted briefs for amici curiae:
            Jason Gerhard, Matthew Coulon, Tom Mannion, Nikki McCarter, Diane Kelley, & Leah Cushman, pro se.
            Jay Edward Simkin, pro se. 
            Andrea Joy Campbell, Attorney General, Carlos Cousins, Grace Gohlke, & Nicole Nixon, Assistant Attorneys General, for the Attorney General.
            John M. Formella, New Hampshire Attorney General, Anthony J. Galdieri, New Hampshire Solicitor General, & Brandon F. Chase, Assistant New Hampshire Attorney General, for the State of New Hampshire.
            Joshua M. Daniels & Lisa J. Steele for Massachusetts Association of Criminal Defense Lawyers.
            Clark M. Neily, III, & Christopher D. Barnewolt, of the District of Columbia, & Kevin J. Powers for Cato Institute.
            GAZIANO, J.  This is one of two cases we decide today in which we determine the constitutionality of the Commonwealth's nonresident firearm licensing scheme.[1]  See Commonwealth v. Donnell, 495 Mass.     (2025).  While we consider a prior version of the nonresident firearm licensing scheme in Donnell, here we consider the current version of that scheme.  See St. 2022, c. 175, §§ 17B-22 (effective Aug. 10, 2022).  Specifically, we address whether the current nonresident firearm licensing scheme violates the right to keep and bear arms under the Second Amendment to the United States Constitution or the rights to travel and to equal protection under the Fourteenth Amendment to the United States Constitution.  We hold that it does not.
            In the Commonwealth, unlicensed possession of a firearm outside of one's residence or place of business is unlawful.  G. L. c. 269, § 10 (a) (§ 10 [a]).  Under G. L. c. 140, § 131F (§ 131F), a firearms license "shall be issued" to a nonresident applicant so long as that applicant is neither a "prohibited person," such as a felon or minor, or a person "determined unsuitable," about whom, as provided under G. L. c. 140, § 131, "credible information" exists that issuing a license would pose "a risk to public safety or a risk of danger to self or others."[2]
            The defendant, a New Hampshire resident who did not obtain a Massachusetts firearms license, was involved in a vehicle accident in Massachusetts en route to his place of employment.  After being found in possession of an unlicensed firearm, the defendant was charged with unlawful possession of a firearm in violation of § 10 (a) and unlawful possession of ammunition in violation of G. L. c. 269, § 10 (h) (1).  The defendant filed a motion to dismiss, asserting that the Commonwealth's nonresident firearm licensing scheme violated his Second Amendment right to keep and bear arms in light of New York State Rifle & Pistol Ass'n v. Bruen, 597 U.S. 1 (2022) (Bruen).  The motion judge allowed the defendant's motion to dismiss, and the Commonwealth appealed.
            We hold as follows.  First, we conclude that the defendant lacked standing to bring an as-applied challenge to the Commonwealth's nonresident firearm licensing scheme because only one denied a license under that scheme may challenge it as applied.  We then proceed to consider the merits of a facial challenge to the constitutional validity of the Commonwealth's nonresident firearm licensing scheme.  Applying the test enunciated in Bruen and further clarified in United States v. Rahimi, 602 U.S. 680 (2024), we hold that both the "why" of that scheme -- restricting access to firearms by demonstrably dangerous persons -- and the "how" of that scheme -- a "shall issue" licensing regime -- are "consistent with the Nation's historical tradition of firearm regulation."  Bruen, 597 U.S. at 24.  Hence, the Commonwealth's nonresident firearm licensing scheme is facially consistent with the Second Amendment right to keep and bear arms.  Because that scheme does not penalize nonresidents' right to travel, and because differences in how that scheme operates for residents versus nonresidents are rationally related to legitimate State interests, the Commonwealth's nonresident firearm licensing scheme is also facially consistent with the Fourteenth Amendment rights to travel and to equal protection.
            In sum, the defendant's facial challenge to the constitutional validity of the Commonwealth's nonresident firearm licensing scheme fails.  We therefore reverse the motion judge's order allowing the defendant's motion to dismiss.[3]
            Background.  1.  Facts.  We recite the relevant facts from the application for criminal complaint.  See Commonwealth v. Ilya I., 470 Mass. 625, 626 (2015).  On September 22, 2022, at approximately 8 A.M., Trooper Avery Morin and Lieutenant Dana Atkinson of the State police responded to the scene of a two-vehicle crash on Interstate 495 in Lowell.  On arrival, Morin observed a 2021 Toyota Tundra with New Hampshire license plates and a Freightliner box truck with Massachusetts license plates in the highway's breakdown lane.  The defendant was the operator of the Toyota.  When Morin approached the defendant, who was outside of his vehicle, the defendant removed a nine millimeter Ruger pistol from his pocket and stated, "I just want to let you know that I have this."  Morin asked if the weapon was loaded.  The defendant stated that it was not loaded and "rack[ed]" it in full view of the trooper to so demonstrate.  Morin then instructed the defendant to secure the weapon in his pocket and to sit on the guardrail in front of his vehicle.
            After speaking with the operator of the box truck, Morin returned to speak to the defendant.  Prior to securing the firearm, Morin asked the defendant if he possessed a license to carry a firearm in Massachusetts.  He also asked the defendant to identify the origin and destination of his trip.  The defendant stated that he did not possess a license to carry a firearm in Massachusetts, and further responded that he was traveling from his home in Rochester, New Hampshire, to his place of work in Massachusetts.  Morin seized the pistol, along with a magazine loaded with twelve rounds of ammunition.  Morin then "returned to [his] cruiser and confirmed [not only] that [the defendant] did not possess a license to carry in Massachusetts," but also "that [the defendant] was not [F]ederally prohibited from carrying a firearm."  The defendant was cited for a civil motor vehicle infraction related to the crash with the box truck.
            2.  Prior proceedings.  On November 28, 2022, the defendant was arraigned in the District Court on a complaint charging him with unlawful possession of a firearm in violation of § 10 (a), and unlawful possession of ammunition in violation of G. L. c. 269, § 10 (h) (1).[4]  On June 27, 2023, the defendant filed a motion to dismiss, arguing, inter alia, that, in light of Bruen, the Commonwealth's nonresident firearm licensing scheme violates his Second Amendment rights as a nonresident of the Commonwealth.
            After a nonevidentiary hearing, the motion judge issued a written memorandum of decision on August 21, 2023, allowing the defendant's motion to dismiss.  In his memorandum, the motion judge adopted portions of his decision allowing a motion to dismiss in Commonwealth vs. Donnell, Mass. Dist. Ct., No. 2211CR002835 (Lowell Div. Aug. 3, 2023).  See Donnell, 495 Mass at    .  Specifically, the judge found that the Commonwealth failed to meet its burden under Bruen of demonstrating that § 131F is consistent with the nation's history and tradition of firearm regulation, and that § 10 (a) is therefore "unconstitutional as applied to this particularly situated defendant."
            The Commonwealth filed a motion for reconsideration, which the motion judge denied orally and by margin endorsement at a hearing held the following month.  The Commonwealth timely appealed from the motion judge's rulings, and the case was docketed in the Appeals Court.  On February 16, 2024, this court granted the Commonwealth's request for direct appellate review.
            Discussion.  The Commonwealth raises two principal arguments on appeal in support of its contention that the motion judge erred in allowing the defendant's motion to dismiss.  First, the Commonwealth asserts that the defendant lacks standing to raise an as-applied challenge, where he never applied for (and was not denied) a firearms license pursuant to the challenged licensing scheme.  Second, while the motion judge did not address any facial challenge to the Commonwealth's nonresident firearm licensing scheme, the Commonwealth further asserts that any such challenge under the Second Amendment or the Fourteenth Amendment would also fail.
            1.  Standing to bring an as-applied challenge.  We begin with first principles.  "Only one whose rights are impaired by a statute can raise the question of its constitutionality, and he can object to the statute only as applied to him."  Massachusetts Comm'n Against Discrimination v. Colangelo, 344 Mass. 387, 390 (1962).  Likewise, "[a]s a general matter, to establish standing to challenge an allegedly unconstitutional policy, a plaintiff must submit to the challenged policy."  Jackson-Bey v. Hanslmaier, 115 F.3d 1091, 1096 (2d Cir. 1997).
            These principles have a well-established corollary in the context of standing to challenge the Commonwealth's firearm licensing scheme.  This court has long held that standing to bring an as-applied challenge to the Commonwealth's firearm licensing scheme requires having applied for (and been denied) a license or firearm identification (FID) card pursuant to that scheme.  See, e.g., Commonwealth v. Cassidy, 479 Mass. 527, 539 n.10, cert. denied, 586 U.S. 876 (2018) ("Because [the defendant] did not apply for a license or an FID card, the defendant cannot properly raise an as-applied challenge, and he appropriately does not do so" [citations omitted]); Commonwealth v. Loadholt, 460 Mass. 723, 725 (2011) ("because the defendant in this case has not asserted or made any showing that he applied for [and was denied] an FID card to possess a firearm and ammunition, we conclude that he may not challenge his convictions under G. L. c. 269, § 10 [h] [1], as unconstitutional under the Second Amendment"); Commonwealth v. Powell, 459 Mass. 572, 589-590 (2011), cert. denied, 565 U.S. 1262 (2012) ("Instead of applying for an FID card, the defendant chose to violate the law.  In these circumstances, we conclude that he may not challenge his conviction under G. L. c. 269, § 10 [h] [1]").[5]
            The defendant contends that these holdings are undermined by Bruen, reasoning that the "premise of denying standing in Powell and other pre-Bruen opinions . . . was that there was no right to carry outside the home in the first instance."  This contention misapprehends the basis for our holdings on standing.  Standing, after all, is a "threshold" inquiry.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 569 (1992).  As such, this court is required to address it before entertaining the substantive validity of the law or policy that is being challenged.  The holding that licensure denial is a prerequisite for bringing an as-applied challenge to the Commonwealth's firearm licensing scheme is not premised on any substantive position, one way or the other, about the constitutional validity of that particular scheme.  Rather, it simply reflects the more general principle that one may not challenge a licensing scheme if one has "never applied for a license, was never denied a hearing, and in no way was ever refused a license."  Commonwealth v. Gordon, 354 Mass. 722, 724-725 (1968) (affirming dismissal of equal protection challenge to licensing scheme governing street vendors).
            The defendant also cites several Federal decisions to support his contention that having applied for (and been denied) a license is not a requirement of standing to bring an as-applied challenge to a firearm licensing scheme.  But those decisions are distinguishable from the case at bar.  For example, the United States Court of Appeals for the Third Circuit recently held that plaintiffs who had not been denied a firearms license had standing to challenge Pennsylvania's firearm licensing scheme.  Lara v. Commissioner Pa. State Police, 91 F.4th 122, 138-140 (3d. Cir.), judgment vacated on other grounds sub nom. Paris v. Lara, 145 S. Ct. 369 (2024).  However, the plaintiffs in that case were ineligible to apply for a license in the first place:  they were all between eighteen and twenty years old, and only persons who were at least twenty-one years old were eligible to apply under the challenged licensing scheme.  Id. at 127.[6]  By contrast, nothing in the Commonwealth's nonresident firearm licensing scheme precluded the defendant from applying for a nonresident temporary license under § 131F; he simply chose not to do so.
            More broadly, Federal case law on standing under art. III of the United States Constitution mirrors this court's holdings that licensure denial is a prerequisite to bring an as-applied challenge to a firearm licensing scheme.  Compare, e.g., United States v. Decastro, 682 F.3d 160, 164 (2d Cir. 2012), cert. denied, 568 U.S. 1092 (2013) ("because [the defendant] failed to apply for a gun license in New York, he lacks standing to challenge the licensing laws of the [S]tate"), and Fletcher v. Haas, 851 F. Supp. 2d 287, 291 (D. Mass. 2012) (rejecting organizational standing claim on grounds that no identified member would have standing to sue as individual because "[n]either [organization] has identified a single member who sought to obtain a license to carry a firearm in Massachusetts, let alone was denied"), with Commonwealth v. Johnson, 461 Mass. 44, 58 (2011) ("It does not appear in this case that the defendant has raised an as-applied challenge to the Commonwealth's statutory licensing scheme, nor could he properly do so . . . , [as] there was no evidence that the defendant ever applied for a license to carry a firearm or an FID card").
            The defendant has standing to bring an as-applied challenge to the Commonwealth's nonresident firearm licensing scheme if -- but only if -- the defendant applied for (and was denied) a license under that scheme.  Because the defendant did not do so, he lacks standing to bring an as-applied challenge to the Commonwealth's nonresident firearm licensing scheme.
            2.  Merits of a facial challenge.  Although the defendant does not have standing to bring an as-applied challenge to the Commonwealth's nonresident firearm licensing scheme, that holding does not end our inquiry.  "[I]n a prosecution for violation of a licensing statute which is unconstitutional on its face, the issue of its validity is presented even in the absence of an application for a license."  Gordon, 354 Mass. at 725.  In particular, the defendant's failure to apply for a license does not preclude a facial challenge to the constitutional validity of the Commonwealth's nonresident firearm licensing scheme.  Therefore, we evaluate the defendant's constitutional challenge to the Commonwealth's nonresident firearm licensing scheme under the standards that govern facial challenges.
            As a general matter, the United States Supreme Court has cautioned that facial challenges are "disfavored" because they "often rest on speculation" and "threaten to short circuit the democratic process."  Washington State Grange v. Washington State Republican Party, 552 U.S. 442, 450-451 (2008).  Consequently, a facial challenge is "the 'most difficult challenge to mount successfully,' because it requires a defendant to 'establish that no set of circumstances exists under which the [statute] would be valid.'"  Rahimi, 602 U.S. at 693, quoting United States v. Salerno, 481 U.S. 739, 745 (1987).  See Blixt v. Blixt, 437 Mass. 649, 652 (2002), cert. denied, 537 U.S. 1189 (2003) ("A facial challenge to the constitutional validity of a statute is the weakest form of challenge, and the one that is the least likely to succeed").  For the Commonwealth to prevail, it "need only demonstrate" that the Commonwealth's nonresident firearm licensing scheme is compatible with the Second Amendment and with the Fourteenth Amendment "in some of its applications."  Rahimi, supra.  Conversely, the defendant shall prevail if and only if he demonstrates "that the law is unconstitutional in all of its applications."  Washington State Grange, supra at 449.
            a.  The meaning of § 131F.  In order to determine whether there exist any circumstances in which the Commonwealth's nonresident firearm licensing scheme is constitutionally valid, it is necessary first to resolve disagreement between the parties about the meaning of one of the challenged provisions within that scheme.  Specifically, the defendant and the Commonwealth advance substantially different interpretations of the meaning of § 131F with respect to the conditions under which temporary licenses "shall be issued" to nonresidents.  The disputed portion of § 131F provides:
"A temporary license to carry firearms, rifles or shotguns or feeding devices or ammunition therefor, within the commonwealth, shall be issued by the colonel of state police, or persons authorized by him, to a nonresident or any person not falling within the jurisdiction of a local licensing authority or to an alien that resides outside the commonwealth for purposes of firearms competition if it appears that the applicant is not a prohibited person and is not determined unsuitable to be issued a license as set forth in [§] 131."
G. L. c. 140, § 131F.  The defendant asserts that § 131F provides that temporary licenses "shall be issued" to nonresidents only "for purposes of firearms competition."  On the defendant's reading, § 131F does not provide that temporary licenses "shall be issued" to nonresidents for ordinary purposes of self-defense.  By contrast, the Commonwealth asserts that the language "for purposes of firearms competition" only applies to "an alien that resides outside the commonwealth" and does not apply to "a nonresident."  On the Commonwealth's reading, § 131F does provide that temporary licenses "shall be issued" to nonresidents for ordinary purposes of self-defense.
            The correct interpretation of § 131F depends on whether the restriction "for purposes of firearms competition" applies to every enumerated category of applicant -- "nonresident[s]," "person[s] not falling within the jurisdiction of a local licensing authority," and "alien[s] that reside[] outside the commonwealth" -- or instead only to the last applicant category on the list:  "alien[s] that reside[] outside the commonwealth."  G. L. c. 140, § 131F.  This question has a familiar form.  In general, the correct interpretation of a statutory provision often depends on whether limiting language appearing at the end of a list applies only to the last item on the list or to every item on the list.  Indeed, this question arises frequently enough that there has emerged a recognized default rule:  the last antecedent rule, according to which "a court determines that qualifying words or phrases modify the words or phrases immediately preceding them and not words or phrases more remote, unless the extension is necessary from the context or the spirit of the entire writing."  Black's Law Dictionary 1602 (12th ed. 2024).[7]  See A. Scalia & B.A. Garner, Reading Law:  The Interpretation of Legal Texts 152-153 (2012).
            Both the courts of the Commonwealth and the United States Supreme Court have endorsed and applied the last antecedent rule.  See Lockhart v. United States, 577 U.S. 347, 351 (2016) ("When this Court has interpreted statutes that include a list of terms or phrases followed by a limiting clause, we have typically applied an interpretive strategy called the rule of the last antecedent," which "provides that a limiting clause or phrase . . . should ordinarily be read as modifying only the noun or phrase that it immediately follows" [quotations and citations omitted]); Hopkins v. Hopkins, 287 Mass. 542, 547 (1934) ("It is the general rule of statutory as well as grammatical construction that a modifying clause is confined to the last antecedent unless there is something in the subject matter or dominant purpose which requires a different interpretation"); New England Survey Sys., Inc. v. Department of Indus. Accs., 89 Mass. App. Ct. 631, 638 n.17 (2016) ("a modifying clause is confined to the phrase that immediately precedes it and not to the phrases appearing earlier").[8]
            As applied to § 131F, the last antecedent rule validates the Commonwealth's position.  Specifically, pursuant to the last antecedent rule, the limiting language "for purposes of firearms competition" applies only to "alien[s] that reside[] outside the commonwealth."  Because that limiting language does not apply to "nonresident[s]," the last antecedent rule implies that § 131F provides that a temporary license "shall be issued" to a nonresident not only for purposes of firearms competition but also for other purposes -- so long as the nonresident is "not a prohibited person and is not determined unsuitable."
            To be sure, "[t]he last antecedent rule is not always a certain guide."  New England Survey Sys., Inc., 89 Mass. App. Ct. at 638.  In particular, it does not necessarily apply if the interpretation that would result goes against the controlling text's "context or  . . . spirit," Black's Law Dictionary 1602 (12th ed. 2024), or "subject matter or dominant purpose," Hopkins, 287 Mass. at 547.  In this case, the context and purpose of § 131F do not count against applying the last antecedent rule.  On the contrary, they reinforce doing so.
            When interpreting a statute, one relevant contextual consideration is whether a particular interpretation of one provision would render that provision incoherent or at odds with another, nearby provision.  "Where possible, we seek to harmonize the provisions of a statute with related provisions that are part of the same statutory scheme . . . ."  Chin v. Merriot, 470 Mass. 527, 537 (2015).  Here, one related provision is G. L. c. 140, § 131G (§ 131G), which provides -- in relevant part -- that "[a]ny person who is not a resident of the commonwealth may carry a pistol or revolver in or through the commonwealth for the purpose of taking part in a pistol or revolver competition."
            The Commonwealth's interpretation, supported by the last antecedent rule, renders § 131F coherent with the plain meaning of § 131G.  Specifically, while § 131F establishes the general rule that nonresidents who are not prohibited persons and not determined unsuitable "shall be issued" temporary licenses, irrespective of purpose, § 131G exempts a special category of nonresidents from the licensing regime:  nonresidents who carry "for the purpose of taking part in a pistol or revolver competition."
            By comparison, the interpretation of § 131F advanced by the defendant renders the two provisions less coherent with each other.  On the defendant's reading, § 131F provides that a nonresident who seeks to carry a firearm only "for purposes of firearms competition" "shall be issued" a temporary license, while § 131G exempts nonresidents who seek to carry a pistol or revolver for purposes of firearms competition from the temporary licensing regime so long as the competition in question is "a pistol or revolver competition."  While that interpretation does not, strictly speaking, render the two provisions contradictory, it does generate a less "harmoni[ous]" interpretation of § 131F and § 131G than the interpretation that follows from the last antecedent rule.  Chin, 470 Mass. at 537.  Accordingly, the consequences of the parties' competing interpretations of § 131F for neighboring provisions reinforces -- and certainly does not override -- application of the last antecedent rule.
            Likewise, one relevant consideration is whether the Legislature would likely have intended the interpretation implied by the last antecedent rule.  Of special relevance, "we assume that the Legislature intends its statutes to pass constitutional muster, and therefore 'we construe statutes to avoid constitutional problems where possible.'"  Chapman, petitioner, 482 Mass. 293, 305-306 (2019), quoting Commonwealth v. Maloney, 447 Mass. 577, 589 (2006).  On the defendant's reading, § 131F makes no provision whatsoever for nonresidents who seek to carry for purposes of self-defense -- starkly implicating "the central component of the [Second Amendment] right itself."  District of Columbia v. Heller, 554 U.S. 570, 599 (2008).  By contrast, under the Commonwealth's interpretation, § 131F does provide for nonresident self-defense.  Reading § 131F in accordance with the last antecedent rule therefore is reinforced -- and certainly not overridden -- by the fact that doing so avoids squarely implicating the most fundamental of Second Amendment interests.  Accordingly, we conclude that the limiting language "for purposes of firearms competition" does not apply to "nonresident[s]" under § 131F.
            b.  The Second Amendment challenge.  Having determined the meaning of § 131F, we now address the merits of the defendant's Second Amendment challenge to the Commonwealth's nonresident firearm licensing scheme.  We begin with a brief overview of four foundational United States Supreme Court decisions that define the landscape of contemporary Second Amendment jurisprudence:  Heller, 554 U.S. 570; McDonald v. Chicago, 561 U.S. 742 (2010); Bruen, 597 U.S. 1; and Rahimi, 602 U.S. 680.
            Heller, 554 U.S. at 574-575, concerned a set of District of Columbia statutes, which, among other things, prohibited the registration of handguns while simultaneously making it a crime to carry unregistered firearms.  The Court began with a close reading of the text of the constitutional amendment:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  Id. at 576, quoting Second Amendment to the United States Constitution.  First, the Court held that the Second Amendment's prefatory clause -- i.e., "A well regulated Militia, being necessary to the security of a free State" -- "announces a purpose" but "does not limit or expand the scope of the operative clause."  Heller, supra at 577-578.  Second, with respect to the operative clause, the Court held that the term "the people" in the text of the Second Amendment "unambiguously refers to all members of the political community, not an unspecified subset."  Id. at 579-580.  Third, the Court held that to "bear arms" means to "wear, bear, or carry . . . upon the person or in the clothing or in a pocket, for the purpose . . . of being armed and ready for offensive or defensive action in a case of conflict with another person" (citation omitted).  Id. at 584.  Putting these elements together, the Court concluded that the Second Amendment "guarantee[s] the individual right to possess and carry weapons in case of confrontation."  Id. at 592.  On that basis, the Court invalidated all of the challenged District of Columbia regulations.  Id. at 592-593, 595.
            At the same time, the Court also qualified the scope of its holding in several relevant respects.  First, the Court clarified that the Second Amendment right to keep and bear arms is "not unlimited."  Heller, 554 U.S. at 595.  In particular, the Court noted that "from Blackstone through the [Nineteen]th-[C]entury cases, commentators and courts routinely explained that the right was not a right to keep and carry any weapon whatsoever in any manner whatsoever and for whatever purpose."  Id. at 626.  Second, without purporting to have "undertake[n] an exhaustive historical analysis . . . of the full scope of the Second Amendment," the Court clarified that "nothing in [its] opinion should be taken to cast doubt on longstanding prohibitions on the possession of firearms by felons and the mentally ill, or laws forbidding the carrying of firearms in sensitive places such as schools and government buildings, or laws imposing conditions and qualifications on the commercial sale of arms."  Id. at 626-627.
            The Court reiterated these qualifications in McDonald, 561 U.S. at 786.  At issue before the Court was whether the due process clause of the Fourteenth Amendment incorporates the Second Amendment, such that the latter applies with equal force to the States as to the Federal government.  Id. at 753.  The Court held that it does.  Id. at 778.  A plurality of the Court "repeat[ed] those assurances" from Heller regarding "longstanding" prohibitions on firearm possession by felons and the mentally ill, carrying of firearms in sensitive places, and conditions and qualifications on commercial arms sales.  Id. at 786.
            Bruen, 597 U.S. at 11-12, concerned a challenge to the State of New York's licensing scheme for carrying firearms in public.  Under that scheme, persons seeking to carry a firearm outside the home for self-defense were obligated to obtain an "unrestricted license" that required a showing of "proper cause."  Id. at 12.  Although "[n]o New York statute define[d] 'proper cause,'" New York courts had understood a showing of proper cause to require "demonstrat[ing] a special need for self-protection distinguishable from that of the general community" (citation omitted).  Id.  Because of its "proper cause" requirement, the challenged licensing scheme constituted a "may issue" regime, under which "authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria."  Id. at 14.  This stands in contrast to the "shall issue" regimes then in force in forty-three States, wherein "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements, without granting licensing officials discretion to deny licenses based on a perceived lack of need or suitability."  Id. at 13.
            In determining whether New York's "may issue" regime was compatible with the requirements of the Second Amendment, the Court began by clarifying the standard for evaluating a Second Amendment challenge.  Bruen, 597 U.S. at 18-19.  Prior to Bruen, a number of the United States Courts of Appeals had developed a standard for evaluating Second Amendment challenges under which courts first determined whether the challenged law regulated activity "falling outside the scope of the right as originally understood," Kanter v. Barr, 919 F.3d 437, 441 (7th Cir. 2019); if so, they held that "the regulated activity is categorically unprotected," United States v. Greeno, 679 F.3d 510, 518 (6th Cir.), cert. denied, 568 U.S. 922 (2012), and if not, they proceeded to apply different levels of scrutiny -- strict or intermediate -- depending on whether the challenged regulation burdened "core" Second Amendment interests, id. at 517.  See, e.g., Kanter, supra.  The Court in Bruen, supra at 19, rejected this two-step approach, deeming it "one step too many."  Instead, the Court formulated the controlling standard for evaluating Second Amendment challenges to firearm regulations by focusing squarely on the historical meaning of the Second Amendment.  As the Court explained:
"When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.  The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation.  Only then may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command'" (citation omitted).
Id. at 24.
            The crucial question raised by Bruen's standard is what it means for a certain regulation to be "consistent" with the nation's "historical tradition of firearm regulation."  Bruen, 597 U.S. at 24.  Without purporting to "provide an exhaustive survey of the features that render [modern] regulations relevantly similar [to historical regulations]," the Court highlighted "two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense."  Id. at 29.  Accordingly, "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are 'central' considerations when engaging in an analogical inquiry" (citation and emphasis omitted).  Id.  This analogical inquiry "requires only that the government identify a well-established and representative historical analogue, not a historical twin."  Id. at 30.  In particular, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster."  Id.
            The Court's application of this standard to the challenged New York regulations proceeded in two steps.  First, the Court held that the defendants' conduct fell within the "Second Amendment's plain text" and was therefore "presumptively protect[ed]."  Bruen, 597 U.S. at 24, 33.  Specifically, the Court noted that it was "undisputed" that defendants were part of the "people" to whom the Second Amendment refers in virtue of being "ordinary, law-abiding, adult citizens."  Id. at 31-32.  Likewise, the Court noted that it was "[un]dispute[d]" that handguns are "arms" within the meaning of the Second Amendment because they are "weapons in common use today for self-defense" (quotation and citation omitted).  Id. at 32.  Finally, the Court held that "carrying handguns publicly for self-defense" qualifies as "bearing" arms within the meaning of the Second Amendment because the "definition of 'bear' naturally encompasses public carry" and "self-defense is 'the central component of the [Second Amendment] right itself'" (citation and emphasis omitted).  Id.
            Second, the Court held that New York's "proper-cause" regime was not "consistent with this Nation's historical tradition of firearm regulation."  Bruen, 597 U.S. at 34, 38, 70.  In short, the Court concluded from reviewing the historical record that "[t]hroughout modern Anglo-American history, the right to keep and bear arms in public has traditionally been subject to well-defined restrictions governing the intent for which one could carry arms, the manner of carry, or the exceptional circumstances under which one could not carry arms."  Id. at 38.  However, the historical record "does not demonstrate a tradition of broadly prohibiting the public carry of commonly used firearms for self-defense."  Id.  In particular, there is no "historical tradition limiting public carry only to those law-abiding citizens who demonstrate a special need for self-defense."  Id.  From these premises, the Court concluded that New York's "proper-cause" regime violated the Second Amendment right to keep and bear arms.  Id. at 38-39.
            Finally, at issue before the Court in Rahimi, 602 U.S. at 693, was a facial challenge to the constitutionality of a Federal statute, 18 U.S.C. § 922(g)(8) (§ 922[g][8]).  This Federal law prohibits firearm possession by a person subject to a domestic violence restraining order where the order includes a finding that the person "represents a credible threat to the physical safety of [an] intimate partner or [a] child [of such intimate partner or person]."  18 U.S.C. § 922(g)(8).  The Court began its analysis by observing that "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm to others from misusing firearms."  Rahimi, supra at 690.  After a review of various founding-era firearm regulations, the Court reaffirmed that these laws "confirm what common sense suggests:  [w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."  Id. at 698.  Moreover, the Court held that § 922(g)(8) "fits neatly within the tradition" represented by these founding-era laws.  Id.  Specifically, because § 922(g)(8) "restricts gun use to mitigate demonstrated threats of physical violence," it comports with the "why" of the relevant historical laws.  Rahimi, supra at 698.  And because, like surety and going armed laws, § 922(g)(8) applies only following a determination that the relevant person "likely would threaten or had threatened another with a weapon," the burden it imposes is consistent with the "how" of such laws.  Rahimi, supra at 699-700.  Given these premises, the Court "ha[d] no trouble concluding that [§ ]922(g)(8) survive[d] [the defendant's] facial challenge."  Id. at 700.
            i.  Bruen step one.  Having reviewed contemporary Second Amendment jurisprudence, we are now in a position to ask where the Commonwealth's nonresident firearm licensing scheme fits within that doctrinal landscape.  Our first step is to determine whether the regulated conduct falls within the "Second Amendment's plain text."  Bruen, 597 U.S. at 24.  This textual question depends on whether the persons subjected to the regulation at issue are members of "the people,"[9] whether the weapons at issue are "[a]rms,"[10] and whether the specific conduct at issue qualifies as "keep[ing]" or "bear[ing]"[11] within the meaning of the Second Amendment.[12]
            The type of regulated conduct at issue falls within the "Second Amendment's plain text" on all three counts and is therefore "presumptively protect[ed]."  Bruen, 597 U.S. at 24.  There is no dispute that nonresidents of the State whose firearms regulations are at issue belong to the "people" protected by the Second Amendment so long as they are "ordinary, law-abiding, adult citizens."  Id. at 31.  Likewise, there is no dispute that handguns are "arms" within the meaning of the Second Amendment because they are "weapons in common use today for self-defense" (quotation and citation omitted).  Id. at 32.  Finally, there is no dispute that possessing a firearm outside of one's residence or place of business qualifies as "bearing," as the "definition of 'bear' naturally encompasses public carry."  Id.  We therefore proceed to step two of the Bruen analysis.
            ii.  Bruen step two.  Our next question is whether the Commonwealth has demonstrated that its nonresident firearm licensing scheme is "consistent with the Nation's historical tradition of firearm regulation."  Bruen, 597 U.S. at 24.  As noted supra, at this stage of the analysis, the United States Supreme Court has "point[ed] toward at least two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense."  Id. at 29.  We apply each metric in turn.
            A.  The "why" of §§ 131 and 131F.  The "why" inquiry requires us first to articulate the purpose of the Commonwealth's nonresident firearm licensing scheme.  Bearing that purpose in mind, we then must ask "if laws at the founding regulated firearm use to address particular problems," as "that will be a strong indicator that contemporary laws imposing similar restrictions for similar reasons fall within a permissible category of regulations."  Rahimi, 602 U.S. at 692.
            We have already established that § 131F creates a general entitlement on the part of nonresidents to obtain firearm licenses where the statutory conditions are met.  Specifically, so long as nonresident applicants are neither "prohibited" nor "determined unsuitable" within the meaning of § 131, such applicants "shall be issued" temporary firearms licenses.  G. L. c. 140, § 131F.  Because a nonresident's entitlement to a temporary license is restricted only if they are "prohibited" or "determined unsuitable," we shall look to the definition of those terms, as set forth in § 131, to clarify the purposes for which the Commonwealth's nonresident firearm licensing scheme restricts nonresidents.  See Commonwealth v. Perez Narvaez, 490 Mass. 807, 809 (2022) ("The words of the statute generally are the main source from which we ascertain legislative purpose").  In particular, because the defendant does not challenge the Commonwealth's restrictions on "prohibited" persons, we examine only the definition of "determined unsuitable."
            General Laws c. 140, § 131 (d), describes the conditions warranting a determination of unsuitability by a "licensing authority"[13] as well as the process by which such a determination is made: 
"The licensing authority shall deny the application or renewal of a license to carry, or suspend or revoke a license . . . if the applicant or licensee is unsuitable to be issued or to continue to hold a license to carry.  A determination of unsuitability shall be based on reliable, articulable and credible information that the applicant or licensee has exhibited or engaged in behavior that suggests that, if issued a license, the applicant or licensee may create a risk to public safety or a risk of danger to self or others.  Upon denial of an application or renewal of a license based on a determination of unsuitability, the licensing authority shall notify the applicant in writing setting forth the specific reasons for the determination . . . .  Upon revoking or suspending a license based on a determination of unsuitability, the licensing authority shall notify the holder of a license in writing setting forth the specific reasons for the determination . . . .  The determination of unsuitability shall be subject to judicial review . . . ."
By the plain terms of § 131 (d), the restriction on nonresidents "determined unsuitable" exists to prevent persons whose "behavior" demonstrates "a risk to public safety or a risk of danger to self or others" from carrying firearms within the Commonwealth.  Importantly, this public safety rationale supplies both a necessary condition and a sufficient condition of unsuitability.  If there is "credible information" that a nonresident applicant would pose a risk to "public safety," "self[,] or others," then that person shall not be granted a license to carry within the Commonwealth, subject to the aforementioned procedural requirements.  G. L. c. 140, § 131 (d).  But only if there exists such "credible information" shall a nonresident applicant be determined unsuitable.  Id.  The question, then, is whether this safety rationale is compatible with "the Nation's historical tradition of firearm regulation."  Bruen, 597 U.S. at 24.
            If there is any point of consensus about what purposes have historically been recognized as a permissible basis for regulating access to firearms, it is "what common sense suggests:  [w]hen an individual poses a clear threat of physical violence to another, the threatening individual may be disarmed."  Rahimi, 602 U.S. at 698.  To that end, "the Second Amendment permits the disarmament of individuals who pose a credible threat to the physical safety of others."  Id. at 693.  See Kanter, 919 F.3d at 451 (Barrett, J., dissenting) ("History is consistent with common sense:  it demonstrates that legislatures have the power to prohibit dangerous people from possessing guns").
            Other State and Federal courts have also recognized the "common sense" proposition that keeping firearms out of the hands of demonstrably dangerous persons is a valid basis on which to restrict access to firearms.  See, e.g., Antonyuk v. James, 120 F.4th 941, 976 (2d Cir. 2024) ("A reasoned denial of a carry license to a person who, if armed, would pose a danger to themselves, others, or to the public interest is consistent with the well-recognized historical tradition of preventing dangerous individuals from possessing weapons"); United States v. Collette, 630 F. Supp. 3d 841, 846 (W.D. Tex. 2022), petition for cert. filed, U.S. Supreme Ct., No. 24-6497 (Feb. 3, 2025) ("The common concern from all three [founding-era ratifying conventions] . . . appears to be threatened violence and the risk of public injury, not felons specifically or even criminals in general"); R.M. v. C.M., 226 A.D.3d 153, 165 (N.Y. 2024) ("the Nation's historical tradition of firearm regulation in keeping dangerous individuals from carrying guns").
            These judicial conclusions find support in relevant historical scholarship.  See, e.g., Greenlee, The Historical Justification for Prohibiting Dangerous Persons from Possessing Arms, 20 Wyo. L. Rev. 249, 265 (2020) ("as was the case with all disarmaments during the colonial period, the justification was always that those being disarmed were dangerous"); Larson, Four Exceptions in Search of a Theory:  District of Columbia v. Heller and Judicial Ipse Dixit, 60 Hastings L.J. 1371, 1377 (2009) (citing historical record for proposition that "any person viewed as potentially dangerous could be disarmed by the government without running afoul of the 'right to bear arms'").  In sum, "[s]ince the founding, our Nation's firearm laws have included provisions preventing individuals who threaten physical harm . . . from misusing firearms."  Rahimi, 602 U.S. at 690.
            To the extent that the Commonwealth restricts the ability of law-abiding citizens to carry firearms within its borders, the justification for so doing is credible, individualized evidence that the person in question would pose a danger if armed.  Both case law and the historical record unequivocally indicate that this justification is consistent with "the Nation's historical tradition of firearm regulation."  Bruen, 597 U.S. at 24.  It follows that with respect to the "why" dimension of assessment, the Commonwealth's nonresident firearm licensing scheme is compatible with the requirements of the Second Amendment.
            However, our inquiry does not end here, for now we must ask if the means by which the Commonwealth pursues the permissible end of restricting access to firearms by demonstrably dangerous people -- i.e., through its "shall issue" licensing scheme -- "impose[s] a comparable burden on the right of armed self-defense" in light of "historical regulations."  Bruen, 597 U.S. at 29.
            B.  The "how" of §§ 131 and 131F.  Licensing schemes of one form or another have been used to regulate firearm use and possession in this country at least since the Nineteenth Century.  See, e.g., The Laws of the State of New-Hampshire; with the Constitutions of the United States and of the State Prefixed 270-271 (I. Long, Jr., ed., 1830) (referring to "permission of the police officers . . . in writing").  More recently, by the time the United States Supreme Court decided Bruen, forty-nine States had employed the mechanism of licensure to regulate firearm use and possession within their borders.  Bruen, 597 U.S. at 11.
            Of course, not all licensing schemes are created equal.  As discussed supra, of special relevance is the distinction highlighted in Bruen, 597 U.S. at 13-14, between "may issue" licensing regimes, under which "authorities have discretion to deny concealed-carry licenses even when the applicant satisfies the statutory criteria," and "shall issue" licensing regimes, wherein "authorities must issue concealed-carry licenses whenever applicants satisfy certain threshold requirements."  The Court elaborated on this distinction in a footnote, identifying several indices of presumptive constitutionality in a "shall issue" regime.  See id. at 38 n.9.[14]  First, "shall issue" regimes "do not require applicants to show an atypical need for armed self-defense."  Id.  This corresponds to the Court's express rationale for invalidating New York's "may issue" regime.  See id. at 11 ("Because the State of New York issues public-carry licenses only when an applicant demonstrates a special need for self-defense, we conclude that the State's licensing regime violates the Constitution").  Second, "shall issue" regimes are "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" (quotation and citation omitted).  Id. at 38 n.9.  Third, "shall issue" regimes "guid[e] licensing officials" by means of "narrow, objective, and definite standards" (citation omitted).  Id.
            In addition to the semantic fact that § 131F employs the phrase "shall be issued," in substance the Commonwealth's nonresident firearm licensing scheme displays all three hallmarks of a "shall issue" regime.  First, any nonresident who is neither a prohibited person nor determined unsuitable pursuant to the criteria and procedures outlined in § 131 "shall be issued" a license to carry.  Applicants need not demonstrate an "atypical need for armed self-defense," Bruen, 597 U.S. at 38 n.9 -- or indeed articulate any purpose for which they seek to possess a firearm outside of their home or place of business.  Second, because the only statutorily permissible ground on which to withhold or revoke a license from a nonprohibited person is a determination that the person would pose "a risk to public safety or a risk of danger to self or others" if armed, G. L. c. 140, § 131 (d), the Commonwealth's nonresident firearm licensing scheme is "designed to ensure only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" (quotation and citation omitted), Bruen, supra.  Third, the statutory criteria for "unsuitability" appropriately "guid[e]" the licensing authority by means of "narrow, objective, and definite standards" (citation omitted).  Id.  Specifically, an applicant can be identified as posing "a risk to public safety or a risk of danger to self or others" if armed only on the condition that the applicant "has exhibited or engaged in behavior" indicating such a risk.  G. L. c. 140, § 131 (d).  Likewise, the determination that an applicant has engaged in the specified behavior indicating the specified safety risk must itself be supported by "reliable, articulable and credible information."  Id.  Subjective, impressionistic judgments of "unsuitability" are thereby proscribed.  In addition, once a determination of unsuitability has been made pursuant to these criteria, the licensing authority "shall notify the applicant in writing setting forth the specific reasons for the determination."  Id.  Finally, if an applicant is unsatisfied with the reasons given for a determination of unsuitability, that applicant may petition for judicial review.  G. L. c. 140, § 131 (d), (f).
            In addition to displaying the substantive hallmarks of a "shall issue" regime, the Commonwealth's nonresident firearm licensing scheme also has historical analogues in the form of firearm regulations motivated by safety considerations.  Two such regulations, as detailed in Rahimi, 602 U.S. at 695-699, and Bruen, 597 U.S. at 46-59, are surety laws and "going armed" laws.  Although these did not employ the specific mechanism of licensure, they employed the more general mechanism of administratively conditioning firearm access by persons for whom individualized evidence of risk was found.  See Bruen, supra at 30 ("even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster").
            As the Court explained in Bruen, 597 U.S. at 55, surety statutes "required certain individuals to post bond before carrying weapons in public."  Importantly, surety statutes "presumed that individuals had a right to public carry," id. at 56, and burdened this right "only when 'attended with circumstances giving just reason to fear that [the person] purposes to make an unlawful use of [arms],'" id., quoting W. Rawle, A View of the Constitution of the United States of America 126 (2d ed. 1829).  The Court in Bruen held that surety statutes were not a historical analogue of New York's "proper cause" regime because the former "were not bans on public carry, and they typically targeted only those threatening to do harm."  Bruen, supra at 55.  Conversely, the Court in Rahimi, 602 U.S. at 698, held that surety statutes were a historical analogue of § 922(g)(8) because both "restrict[] [firearm] use to mitigate demonstrated threats of physical violence."  Going armed laws, by contrast, provided a mechanism for restricting those "who had menaced others with firearms."  Id. at 697.  Specifically, these laws prohibited conduct such as "riding or going armed, with dangerous or unusual weapons, [to] terrify[] the good people of the land."  Id., quoting 4 W. Blackstone, Commentaries *149.  As the Court explained, going armed laws are "relevantly similar" to § 922(g)(8) because -- like surety statutes -- they specifically "appl[y] to individuals found to threaten the physical safety of another."  Rahimi, supra at 698.
            The Commonwealth's nonresident firearm licensing scheme "fits neatly within the tradition the surety and going armed laws represent."  Rahimi, 602 U.S. at 698.  It begins with the presumption that all nonresident applicants "shall be issued" a temporary license and will thereby enjoy the unencumbered right to public carry.  G. L. c. 140, § 131F.  That right is burdened "only when attended with circumstances giving just reason to fear that [the applicant] purposes to make an unlawful use of [arms]" (quotation and citation omitted), Bruen, 597 U.S. at 56 -- specifically, the circumstance that the applicant has "exhibited or engaged in behavior" indicative of "a risk to public safety or a risk of danger to self or others," G. L. c. 140, § 131 (d).  By the same token, the Commonwealth's nonresident firearm licensing scheme is analogous to going armed laws, in that both restrict a person's right to carry only on the basis of "credible information" that the person has engaged in specific, threatening conduct.  Id.
            The defendant maintains that the Commonwealth's nonresident firearm licensing scheme is unsupported by the nation's historical tradition.  Specifically, the defendant argues that "[t]here is no historical law or regulation allowing the government to collectively disarm a broad swath of the public so as to ferret out any individual who is or could be dangerous or 'unsuitable.'"  However, this description mischaracterizes the operation of the Commonwealth's nonresident firearm licensing scheme.  The image evoked by that description is of a regime whereby all citizens must surrender their arms to a government authority, only to reacquire those arms if that authority deems them suitable.  This image misleads.  The Commonwealth's nonresident firearm licensing scheme places an ex ante condition on the right to carry.  Before carrying a firearm in the Commonwealth outside of one's home or place of business, both residents and nonresidents alike must obtain a license; and before issuing a license, the licensing authority must verify that the applicant satisfies the statutory requirement of being neither "prohibited" nor determined "unsuitable" within the specified meaning of § 131 (d).  Although it is true that a person who violates State law by possessing a firearm outside of his residence or place of business without first having obtained a license is liable to disarmament, the Commonwealth's scheme no more "disarm[s] a broad swath of the public" than does any licensing scheme regardless of its substantive requirements.
            The defendant also argues that there is no "historical law or regulation demonstrating that residents of one colony or [S]tate reflexively distrusted armed residents of another colony or [S]tate."  However, there is no evidence that the Commonwealth's scheme is motivated in any way by such attitudes of "reflexive[] distrust" towards nonresidents.  On the contrary, the Commonwealth's firearm licensing scheme applies the same substantive requirements to residents as to nonresidents.  Both must obtain a license in order to possess a firearm outside of their homes or places of business within the Commonwealth, and both "shall be issued" such a license pursuant to the same statutory criteria.  Compare G. L. c. 140, § 131 (d) (residents), with G. L. c. 140, § 131F (nonresidents).  As emphasized, the Commonwealth's firearm licensing scheme operates to ensure "only that those bearing arms in the jurisdiction are, in fact, law-abiding, responsible citizens" (quotation and citation omitted), Bruen, 597 U.S. at 38 n.9 -- whether "those bearing arms in the jurisdiction" are residents of the Commonwealth or nonresidents, id.
            Finally, the defendant asserts a more specific objection to the fact that "processing may take up to [ninety] days" for nonresident license applications.  He characterizes this projected wait time as "another significant curtailment of [his] freedom."  As a threshold matter, we have doubts whether this timeline -- which apparently stems from a webpage, see https://www.mass.gov/how-to/apply-for-a-firearms-license [https://perma.cc/4TAJ-RSWV] -- has "the legal force of a statute or regulation" (citation omitted).  DeCosmo v. Blue Tarp Redev., LLC, 487 Mass. 690, 694–695 (2021).  Putting those doubts to one side, however, the defendant's substantive objection fails on its own terms.
            To be sure, the defendant is correct to highlight Bruen's cautionary note that "we do not rule out constitutional challenges to shall-issue regimes where, for example, lengthy wait times in processing license applications or exorbitant fees deny ordinary citizens their right to public carry."  Bruen, 597 U.S. at 38 n.9.  More broadly, the defendant is correct to point out that "shall issue" licensing regimes do not automatically comply with the Second Amendment, because it is possible for such a regime's procedural requirements to be so onerous that they effectively deny some or all prospective licensees their Second Amendment rights.  Indeed, "any permitting scheme can be put toward abusive ends."  Id.  And it goes without saying that a "shall issue" licensing regime that operated in this "abusive" manner would be the proper subject of an as-applied challenge by persons injured thereby.
            However, as the party bringing a facial challenge to the constitutionality of the Commonwealth's "shall issue" licensing regime, the defendant must demonstrate not that it is possible for the Commonwealth's processing times to deny nonresidents their right to public carry, but that "no set of circumstances exists" under which those processing times are compatible with the Second Amendment (citation omitted).  Rahimi, 602 U.S. at 693.  The defendant has not pointed to any evidence that the Commonwealth's processing times meaningfully hinder the ability of nonresidents to exercise their right to public carry in all circumstances, let alone that the processing timeline is so burdensome that it rises to the level of a constitutional violation.  Indeed, the defendant makes no argument in support of that conclusion apart from asserting that the Commonwealth's processing times are a "significant curtailment" of his freedom.  To invalidate the Commonwealth's "shall issue" regime on that basis alone would require us to "focus[] on hypothetical scenarios where [that regime] might raise constitutional concerns" as opposed to "circumstances in which [that regime is] most likely to be constitutional" -- an error that would leave us "slaying a straw man."  Rahimi, 602 U.S. at 701.  Consequently, the defendant has not carried the "most difficult" burden of bringing a successful facial challenge to the Commonwealth's processing times for nonresident license applicants (citation omitted).  Id. at 693.  See Maryland Shall Issue, Inc. v. Moore, 116 F.4th 211, 227 (4th Cir. 2024), cert. denied, U.S. Supreme Ct., No. 24-373 (Jan. 13, 2025) ("By equating 'infringement' with any temporary delay, the [defendant] improperly discount[s] the Supreme Court's guidance that requirements such as background checks and training instruction, which necessarily occasion some delay, ordinarily will pass constitutional muster"); McRorey v. Garland, 99 F.4th 831, 839 (5th Cir. 2024) ("Our law is plain as can be that some amount of time for background checks is permissible").
            In sum, the defendant's facial challenge under the Second Amendment fails to "establish that no set of circumstances exists under which the [Commonwealth's nonresident firearm licensing scheme] would be valid" (citation omitted).  Rahimi, 602 U.S. at 693.  Therefore, that challenge fails.
            c.  The Fourteenth Amendment challenges.  Finally, the defendant argues that the Commonwealth's nonresident firearm licensing scheme violates the Fourteenth Amendment rights to travel and to equal protection.  Specifically, the defendant objects to several differences between the resident and nonresident licensing processes, including the following:  (1) a resident's license is valid for a period of from five to six years, see G. L. c. 140, § 131 (i), while a nonresident's license is valid for only one year, see G. L. c. 140, § 131F; (2) resident license applications must be processed within forty days, see G. L. c. 140, § 131 (e), whereas nonresidents "must wait up to [ninety] days" for their applications to be processed;[15] and (3) newly arrived or returning residents have a sixty-day grace period in which to obtain an FID card, see G. L. c. 140, § 129C (j), whereas no such grace period exists for nonresidents.  Given the constraints of a facial challenge, the defendant is again limited to arguing that no set of circumstances exists under which that scheme complies with the Fourteenth Amendment.  See Rahimi, 602 U.S. at 693.
            We first evaluate the defendant's argument that the Commonwealth's licensing scheme violates nonresidents' Fourteenth Amendment right to travel.  "The word 'travel' is not found in the text of the Constitution."  Saenz v. Roe, 526 U.S. 489, 498 (1999).  Nevertheless, the right to travel is "firmly embedded in our jurisprudence" such that "imposing a penalty on the exercise of the right to travel violate[s] the Equal Protection Clause unless shown to be necessary to promote a compelling governmental interest" (quotation and citation omitted).  Id. at 498-499.  By the same token, "only those classifications that serve to penalize the exercise of that right [to travel] are tested on that strict scrutiny basis."  Lee v. Commissioner of Revenue, 395 Mass. 527, 530 (1985).  Otherwise, "[l]ess significant impositions on the right to travel have been upheld when supported by a rational or conceivable basis."  Id. at 531.
            Turning now to the substance of the Fourteenth Amendment right to travel, the United States Supreme Court has held that this right contains three basic components:
"[(1)] the right of a citizen of one State to enter and to leave another State, [(2)] the right to be treated as a welcome visitor rather than unfriendly alien when temporarily present in the second State, and . . . [(3)] for those travelers who elect to become permanent residents, the right to be treated like other citizens of that State."
Saenz, 526 U.S. at 500.  Because there is no contention that the defendant elected or attempted to elect to become a permanent resident of the Commonwealth, only the first two components of the right to travel are at issue.[16]
            With respect to the first component, the defendant maintains that "[t]he unchanneled discretion lodged with a colonel as well as lengthy wait times for any license . . . deter (if not preclude) nonresident travel into Massachusetts."  As the reference to "unchanneled discretion" makes evident, the defendant's argument presupposes that the Commonwealth's nonresident firearm licensing scheme violates the Second Amendment right to keep and bear arms.  In essence, the defendant posits a constitutional dilemma:  either "suffer disarmament, arrest and/or prosecution" by entering the Commonwealth with an unlicensed firearm or "yield Second Amendment rights."  Because the Commonwealth's nonresident firearm licensing scheme does not violate the Second Amendment, however, no such constitutional dilemma exists.  On the contrary, the dilemma posited by the defendant merely "repackag[es] a claim that is more appropriately brought under . . . the Second Amendment."  Culp v. Raoul, 921 F.3d 646, 658 (7th Cir. 2019), cert. denied, 141 S. Ct. 109 (2020).
            More generally, the mere fact of having to apply for and obtain a license before entering the Commonwealth with a firearm does not penalize the right to travel.  Although such a requirement "necessarily occasion[s] some delay," Maryland Shall Issue, Inc., 116 F.4th at 227, "[o]nly those statutes resulting in some significant effect on the right to travel will be deemed 'penalties,'" Lee, 395 Mass. at 530.  Unlike a criminal prohibition on transporting indigent nonresidents into the State, Edwards v. California, 314 U.S. 160, 171 (1941), or a conspiracy to prevent members of certain racial groups from crossing State lines using public highways, United States v. Guest, 383 U.S. 745, 757 (1966), the requirement that nonresidents obtain a license on the same terms as residents before publicly carrying a firearm within the Commonwealth does not "impos[e an] obstacle to [nonresidents'] entry into [the Commonwealth]," interfere with "free ingress and regress to and from neighboring States," or otherwise "directly impair the exercise of the right to free interstate movement" (quotation and citation omitted).  Saenz, 526 U.S. at 501.  See Commonwealth v. Harris, 481 Mass. 767, 771, 774 (2019) (rejecting argument that G. L. c. 269, § 10 [a], and G. L. c. 140, § 129C [h], facially violate right to travel).  In short, the Commonwealth's nonresident firearm licensing scheme does not penalize the first component of the right to travel.
            With respect to the second component of the right to travel, the question is whether the Commonwealth's nonresident firearm licensing scheme treats nonresidents as "unfriendly alien[s]" rather than as "welcome visitor[s]."  Saenz, 526 U.S. at 500.  As emphasized, the substantive eligibility criteria for residents and nonresidents are identical:  both must be neither prohibited nor unsuitable within the meaning of § 131.  Because nonresidents must satisfy the same substantive criteria as residents in order to receive a license, § 131F's requirement that nonresidents be neither prohibited nor unsuitable cannot be said to demean nonresidents as "unfriendly aliens."  Simply put, a nonresident "may travel across [the Commonwealth] unimpeded so long as he abides by the reasonable and minimally burdensome regulations necessary to protect the safety of [the Commonwealth]'s citizens."  Johnson v. County of Horry, S.C., 360 Fed. Appx. 466, 471 (4th Cir. 2010) (rejecting right-to-travel challenge to vehicle registration statute both facially and as applied to nonresident).  Therefore, the Commonwealth's nonresident firearm licensing scheme does not penalize the second component of the right to travel, either.
            Finally, it bears noting that the Commonwealth's licensing requirement for nonresidents is not exceptionless.  In particular, unlicensed possession of a pistol or revolver is not unlawful for nonresidents traveling in or through the Commonwealth to participate in a shooting competition or to attend a meeting of firearms collectors, provided they have a valid permit or license issued by a State that denies such licenses to persons with felony or drug convictions.  G. L. c. 140, § 131G.  Likewise, unlicensed possession of a pistol or revolver is not unlawful for nonresidents traveling for the purpose of hunting, provided they have a valid hunting or sporting license issued by their State of destination.  Id.  More generally, Federal law protects the interstate transportation of unloaded and properly secured firearms by anyone who is neither federally prohibited from transporting, shipping, or receiving firearms nor locally prohibited from possessing or carrying such firearms in their place of origin or destination.  18 U.S.C. § 926A.  Hence, although unlicensed possession of a firearm outside of one's home or place of business is generally unlawful under G. L. c. 269, § 10 (a), that requirement is circumscribed by several commonsense exceptions and limitations that facilitate interstate travel by nonresidents.
            In sum, the Commonwealth's nonresident firearm licensing scheme does not violate nonresidents' Fourteenth Amendment right to travel.  On the contrary, it embodies "State and local experimentation with reasonable firearms regulations [that] will continue under the Second Amendment" as part and parcel of the "ability to devise solutions to social problems that suit local needs and values."  McDonald, 561 U.S. at 785.
            We have already seen that the Commonwealth's nonresident firearm licensing scheme does not impermissibly interfere with the Second Amendment right to keep and bear arms.  See supra.  In addition, there is no contention that the Commonwealth's nonresident firearm licensing scheme relies on a suspect classification.  Because the Commonwealth's nonresident firearm licensing scheme neither violates a fundamental right nor relies on a suspect classification, we evaluate the right to travel challenge and the equal protection challenge under rational basis review.[17]  See Romer v. Evans, 517 U.S. 620, 631 (1996) ("if a law neither burdens a fundamental right nor targets a suspect class, we will uphold the legislative classification so long as it bears a rational relation to some legitimate end"); Federal Communications Comm'n v. Beach Communications, Inc., 508 U.S. 307, 313 (1993) ("a statutory classification that neither proceeds along suspect lines nor infringes fundamental constitutional rights must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification"); Massachusetts Bd. of Retirement v. Murgia, 427 U.S. 307, 312 (1976) ("equal protection analysis requires strict scrutiny of a legislative classification only when the classification impermissibly interferes with the exercise of a fundamental right or operates to the peculiar disadvantage of a suspect class" [footnote omitted]); Commonwealth v. Freeman, 472 Mass. 503, 506 (2015) (statutes that "neither burden a fundamental right nor discriminate on the basis of a suspect classification . . . are subject to a rational basis level of judicial scrutiny" [citation omitted]).  Compare Smith v. District of Columbia, 568 F. Supp. 3d 55, 62-66 (D.D.C. 2021) (concluding that District of Columbia regulations violate Second Amendment right to keep and bear arms, and proceeding to evaluate, under strict scrutiny, equal protection challenge to differential treatment of residents versus nonresidents), with United States v. Gil-Solano, 699 F. Supp. 3d 1063, 1073–1074 (D. Nev. 2023) (concluding that Federal prohibition on firearms possession by undocumented immigrants does not violate Second Amendment right to keep and bear arms, and proceeding to evaluate, under rational basis review, equal protection challenge to differential treatment of undocumented versus documented immigrants).
            Under rational basis review, "State action will be upheld as long as it is rationally related to the furtherance of a legitimate [S]tate interest" (quotation and citation omitted).  Commonwealth v. Roman, 489 Mass. 81, 86 (2022).  In particular, "those attacking the rationality of the legislative classification have the burden to negative every conceivable basis which might support it" (quotation and citation omitted).  Federal Communications Comm'n, 508 U.S. at 315.  To be sure, "[t]he distinctions drawn by a challenged statute must bear some rational relationship to a legitimate state end."  McDonald v. Board of Election Comm'rs of Chicago, 394 U.S. 802, 809 (1969).  But statutory classifications "will be set aside . . . only if based on reasons totally unrelated to the pursuit of that goal" and "only if no grounds can be conceived to justify them."  Id.
            In subjecting the Commonwealth's nonresident firearm licensing scheme to rational basis review, we are mindful of two points.  First, at the most general level, the equal protection clause "does not forbid classifications.  It simply keeps governmental decisionmakers from treating differently persons who are in all relevant respects alike."  Nordlinger v. Hahn, 505 U.S. 1, 10 (1992).  By the same token, States "may treat unlike cases accordingly."  Vacco v. Quill, 521 U.S. 793, 799 (1997).  Second, because residents and nonresidents are frequently not "in all relevant respects alike," Nordlinger, supra, there is in general "no duty on the State to have its licensing structure parallel or identical for both residents and nonresidents," Baldwin v. Fish & Game Comm'n of Mont., 436 U.S. 371, 391 (1978).  See, e.g., Marilley v. Bonham, 844 F.3d 841, 854-855 (9th Cir. 2016), cert. denied, 583 U.S. 915 (2017) (finding rational basis for differential fishing license fees in relevant differences between resident versus nonresident fishers); Sestric v. Clark, 765 F.2d 655, 661-662 (7th Cir. 1985), cert. denied, 474 U.S. 1086 (1986) (noting relevant differences between nonresident attorneys and new resident attorneys in affirming rational basis for law permitting only latter to gain bar admission by motion alone).
            Bearing these points in mind, we now consider first whether the Commonwealth's nonresident firearm licensing scheme serves a legitimate State interest.  The Commonwealth has at least a legitimate interest in regulating firearm possession within its borders so as to protect public safety.  See, e.g., Chief of Police of Worcester v. Holden, 470 Mass. 845, 858 (2015) (recognizing "compelling" and "significant" interest in firearm regulation because it "directly affects the physical safety of the citizenry" [citation omitted]); Kanter, 919 F.3d at 451 (Barrett, J., dissenting) (noting "government's undeniably compelling interest in protecting the public from gun violence").  As discussed, the Commonwealth's general interest in public safety implies a more specific interest in ensuring that persons who publicly carry firearms within the Commonwealth satisfy the statutory criteria of being neither prohibited nor unsuitable.  Moreover, that interest applies with equal strength to all persons who wish to publicly carry firearms within the Commonwealth regardless of their State of residence.  The Commonwealth's interest in verifying the suitability and prohibition status of nonresidents who seek to publicly carry firearms within its borders is no weaker than its interest in verifying the suitability and prohibition status of residents who seek to publicly carry firearms within its borders.
            At the same time, the factual reality is that it may often be more costly or time-consuming to obtain and verify the facts that are necessary to verify the suitability and prohibition status of a nonresident applicant as compared to a resident applicant.  Specifically, the Commonwealth provides several statutory mechanisms whereby the relevant licensing authority is automatically notified of disqualifying events that would render a person prohibited or unsuitable to possess a firearms license.  See, e.g., G. L. c. 140, § 131S (upon issuance of extreme risk protection order following petition demonstrating probable risk of bodily injury to self or others, clerk-magistrate required to transmit order to licensing authority and licensing authority required to immediately suspend firearms license); G. L. c. 209A, § 3B (mandating automatic suspension of firearms license upon issuance of temporary or emergency abuse prevention order following complaint demonstrating substantial likelihood of immediate danger of abuse).  The defendant, as the party "attacking the rationality of the legislative classification[,] ha[s] the burden to negative every conceivable basis which might support it" (quotation and citation omitted).  Federal Communications Comm'n, 508 U.S. at 315.  See Murphy v. Department of Correction, 429 Mass. 736, 742 (1999).  The defendant has not pointed to any comparable statutory infrastructure that would ensure that the Commonwealth's licensing authority is equally apprised of disqualifying events outside the Commonwealth's borders that have an impact on the suitability or prohibition status of a nonresident.  Compare G. L. c. 209A, § 3B, with G. L. c. 209A, § 5A (affording full faith and credit to protection orders issued in other jurisdictions, but conditioning enforcement on protected party's filing certified copy of order in Superior Court or Boston Municipal Court along with sworn affidavit asserting that order is presently in effect as written).
            Moreover, it is generally recognized that States often have more reliable access to information having an impact on the firearms license eligibility of their own residents as compared to residents of other States.  See, e.g., Culp, 921 F.3d at 651 (discussing practical difficulties in accessing and monitoring other States' criminal history databases and mental health repositories); Peterson v. LaCabe, 783 F. Supp. 2d 1167, 1175, 1178 (D. Colo. 2011) ("Information about a person's contacts with law enforcement, mental health status, alcohol and drug use, and domestic violence history is simply more likely to be found in the jurisdiction where that person resides" such that "residents and non-residents are not similarly situated in terms of the state's ability to obtain information about and monitor the potential licensee's eligibility for a concealed weapons permit").
            In light of these facts, the complained-of differences between the Commonwealth's treatment of resident and nonresident license applicants survive rational basis review.  We first consider the provision of one year license durations for nonresidents, G. L. c. 140, § 131F,[18] versus five to six year license durations for residents, G. L. c. 140, § 131.  One implication of the license duration differential is that nonresidents are obligated to apply more frequently than residents.  This affords the Commonwealth's licensing authority more frequent opportunities to verify the continued eligibility of nonresidents for a firearms license.  Insofar as it may be more difficult to reliably monitor nonresidents' continued compliance with the substantive requirements of the Commonwealth's firearm licensing scheme, having shorter license durations and concomitantly more frequent opportunities to verify nonresident suitability and prohibition status stand in a "rational relationship" to the Commonwealth's legitimate end of equally verifying the eligibility of all firearms license applicants regardless of their State of residency.  McDonald, 394 U.S. at 809.  At minimum, differential access to eligibility-relevant information about resident and nonresident applicants embodies a "reasonably conceivable state of facts that could provide a rational basis" for the license duration differential.  Federal Communications Comm'n, 508 U.S. at 313.
            Second, we consider the fifty-day differential in expected processing times for nonresidents (ninety days) versus residents (forty days).  As noted, it may often take more time -- and entail higher costs of investigation -- to review nonresident applications as thoroughly as resident applications because out-of-State databases containing relevant information about applicants are not necessarily as accessible to in-State authorities as are in-State databases.  See Culp, 921 F.3d at 651; Peterson, 783 F. Supp. 2d at 1175.  Allowing the Commonwealth's licensing authority more time to process nonresident applications is one rational response to this asymmetry.  At minimum, the fifty-day expected processing time differential is not "totally unrelated to the pursuit of that goal [of evaluating all applicants with equal thoroughness]."  McDonald, 394 U.S. at 809.
            Third, we consider the exclusion of nonresidents from the sixty-day "grace period" available to new or returning residents.  See G. L. c. 140, § 129C (j).  As this Court has held, having a grace period for new or returning residents but not for nonresidents can "be explained by the relatively short, one-year period of validity applicable to nonresident licenses."  Firearms Records Bur. v. Simkin, 466 Mass. 168, 178 (2013).  In particular, a sixty-day grace period for nonresident licenses would represent a waiver of more than fifteen percent of the relevant license duration, whereas a sixty-day grace period for resident licenses waives at most approximately three percent of the relevant license duration.  More broadly, the Legislature could rationally have concluded that extending the sixty-day grace period to nonresidents would effectively nullify the licensure requirement for nonresidents, since any nonresident physically present in the Commonwealth for less than a sixty-day period would presumably thereby become immune from liability for unlicensed possession.  See generally Federal Communications Comm'n, 508 U.S. at 315 (under rational basis review, "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation"); McDonald, 394 U.S. at 809 (legislative distinctions invalidated under rational basis review "only if no grounds can be conceived to justify them").
            In short, each of the complained-of differences in the Commonwealth's treatment of resident versus nonresident firearms license applicants "bear[s] some rational relationship to a legitimate state end."  McDonald, 394 U.S. at 809.  Specifically, the defendant has not fulfilled the attacking party's "burden [under rational basis] to negative every conceivable basis which might support [the Commonwealth's nonresident firearm licensing scheme]" (quotation and citation omitted).  Federal Communications Comm'n, 508 U.S. at 315.  Therefore, the Commonwealth's nonresident firearm licensing scheme does not violate nonresidents' Fourteenth Amendment equal protection rights.
            Conclusion.  The defendant's Second Amendment challenge to the Commonwealth's nonresident firearm licensing scheme fails because "shall issue" licensing schemes the purpose of which is to restrict possession of firearms by demonstrably dangerous persons are consistent with this nation's historical tradition of firearm regulation.  The defendant's Fourteenth Amendment challenge also fails because the Commonwealth's scheme does not violate a nonresident's right to travel or to equal protection.  It follows that the Commonwealth's nonresident firearm licensing scheme is facially valid.  Accordingly, the order allowing the defendant's motion to dismiss is reversed.
            So ordered.
 
footnotes

 
            [1] General Laws c. 269, § 10 (a), makes it a crime to possess a firearm outside of one's residence or place of business without having a license to carry a firearm issued under G. L. c. 140, § 131, or under G. L. c. 140, § 131F.  We refer to these licensing requirements, coupled with the criminalization of possession by those who fail to fulfill them, as the Commonwealth's "firearm licensing scheme."  See, e.g., Commonwealth v. Johnson, 461 Mass. 44, 54-55, 55 n.14 (2011).  Where we discuss the portions of this scheme specifically related to nonresidents -- including the conditions for the issuance of a temporary license to a nonresident pursuant to G. L. c. 140, § 131F, as well as the prohibition of G. L. c. 269, § 10 (a) (3), against a nonresident's possession of a firearm without a temporary license -- we refer to them as the Commonwealth's "nonresident firearm licensing scheme."
            [2] In contrast, the prior iteration of § 131F provided that a nonresident temporary license "may be issued . . . subject to such terms and conditions as [the] colonel [of State police] may deem proper."  G. L. c. 140, § 131F, as amended through St. 2014, c. 284, §§?60, 63.  As discussed in Donnell, this prior scheme was inconsistent with the Second Amendment to the United States Constitution.
            [3] We acknowledge the amicus briefs submitted in support of the defendant by six New Hampshire State Representatives; Jay Edward Simkin; the State of New Hampshire; the Massachusetts Association of Criminal Defense Lawyers; and the Cato Institute.  We further acknowledge the amicus brief submitted in support of the Commonwealth by the Attorney General.
            [4] Because the motion judge allowed the defendant's motion to dismiss only with respect to the § 10 (a) charge, our holding does not address G. L. c. 269, § 10 (h) (1).
            [5] This court has recognized the possibility of standing to bring an as-applied challenge to the firearm licensing scheme absent license denial where the defendant can show that applying would have been futile.  See Commonwealth v. Harris, 481 Mass. 767, 771 n.5 (2019).  In the case at bar, the defendant has not "argued that applying for a license would have been futile."  Id.
            [6] Moreover, the Third Circuit did not endorse -- or even discuss -- the proposition that a person who is eligible to apply for a license and chooses not to may nevertheless have standing to bring an as-applied challenge to the relevant licensing scheme.  Rather, the Third Circuit conferred standing on other grounds.  Lara, 91 F.4th at 139-140.
            [7] The entry notes that "strictly speaking," the "last antecedent rule" applies only to "nouns or noun phrases."  Black's Law Dictionary 1602 (12th ed. 2024).  However, "in modern practice" the last antecedent rule is commonly used to encompass this more general rule, sometimes dubbed the "nearest-reasonable-referent canon."  Id.
            [8] Commonwealth v. Kozubal, 488 Mass. 575, 592 (2021), cert. denied, 142 S. Ct. 2723 (2022), provides a recent example of the last antecedent rule in action.  There, we examined G. L. c. 119, § 21, which defines a "mandated reporter" in part as a "person who is . . . a public or private school teacher, educational administrator, guidance or family counselor, child care worker, person paid to care for or work with a child in any public or private facility, or home or program funded by the commonwealth or licensed under [G. L. c.] 15D."  Invoking the last antecedent rule, we held that "the phrase 'funded by the commonwealth or licensed under [G. L. c.] 15D' modifies only 'home or program'" in the statutory text.  Kozubal, supra.
            [9] Although this case does not present any issues about membership in the "people," a great many post-Bruen challenges to firearm regulations have turned on that issue.  See, e.g., United States v. Duarte, 101 F.4th 657, 666 (9th Cir. 2024), rehearing en banc granted and opinion vacated, 108 F.4th 786 (9th Cir. 2024) (felons); Lara, 91 F.4th at 131-132 (persons eighteen to twenty-one years old); United States v. Sitladeen, 64 F.4th 978, 987 (8th Cir. 2023) (persons illegally present in United States); People v. Anderson, 104 Cal. App. 5th 577, 588-589 (2024) (felons).
            [10] See, e.g., Commonwealth v. Canjura, 494 Mass. 508, 513 (2024) (switchblades are "arms"); Bevis v. Naperville, 85 F.4th 1175, 1194-1197 (7th Cir. 2023) (assault weapons and high-capacity magazines are not "[a]rms"); Grell v. Lopez, 76 F.4th 938, 949-950 (9th Cir. 2023), rehearing en banc granted and opinion vacated, 93 F.4th 1150 (9th Cir. 2024) ("butterfly knives" are "arms").
            [11] See, e.g., United States v. Stambaugh, 641 F. Supp. 3d 1185, 1190 (W.D. Okla. 2022) (receiving firearm falls under Second Amendment's plain text as "condition precedent to keeping and bearing arms"); Defense Distributed vs. Bonta, U.S. Dist. Ct., No. CV 22-6200-GW-AGRx (C.D. Cal. Oct. 21, 2022) (self-manufacturing of firearms does not fall under Second Amendment's plain text); United States vs. Tilotta, U.S. Dist. Ct., No. 3:19-cr-04768-GPC (S.D. Cal. Aug. 30, 2022) (commercial sale and transfer of firearms does not fall under Second Amendment's plain text).
            [12] We note that some courts include a fourth question in the step one inquiry:  namely, whether the relevant regulation constitutes an "infringement."  See, e.g., Maryland Shall Issue, Inc. v. Moore, 116 F.4th 211, 220-222 (4th Cir. 2024), cert. denied, U.S. Supreme Ct., No. 24-373 (Jan. 13, 2025).  However, because the question whether a regulation constitutes an "infringement" may often implicate questions about consistency with history and tradition, we shall maintain the three-part analysis of step one.
            [13] Under G. L. c. 140, § 121, a "[l]icensing authority" is defined as "the chief of police or the board or officer having control of the police in a city or town, or persons authorized by them."
            [14] On the precedential force of this footnote, see, e.g., McRorey v. Garland, 99 F.4th 831, 837 (5th Cir. 2024) ("[Plaintiffs] characterize passages such as footnote 9 as dicta.  We, however, are generally bound by Supreme Court dicta, especially when it is recent and detailed[, a]nd it doesn't get more recent or detailed than Bruen" [quotation and citation omitted]); Maryland Shall Issue, Inc., 116 F.4th at 221-222 ("We are not free to ignore the Supreme Court's substantive dictum on 'shall-issue' licensing laws . . . [and s]o, in accord with the Supreme Court's 'shall-issue' discussion, we hold that non-discretionary 'shall-issue' licensing laws are presumptively constitutional").
            [15] The defendant again cites to a webpage for the ninety-day timeline.  See https://www.mass.gov/how-to/apply-for-a-firearms-license [https://perma.cc/4TAJ-RSWV].  We assume, without deciding, that the defendant's argument as to this timeline is proper here.
            [16] We note that in making his right to travel argument, the defendant nevertheless places significant weight on a line of cases that properly belong to the third component.  These include Attorney Gen. of N.Y. v. Soto-Lopez, 476 U.S. 898 (1986); Memorial Hosp. v. Maricopa County, 415 U.S. 250 (1974); Dunn v. Blumstein, 405 U.S. 330 (1972); Shapiro v. Thompson, 394 U.S. 618 (1969).  All of these cases featured State laws that differentially assigned various rights and benefits to current residents of the State depending on when or for how long those residents had resided in the State.  Such cases differ from the case at bar in two relevant respects.  First, these cases involved statutory distinctions among current residents rather than between current residents and nonresidents.  Second, the laws challenged in these cases categorically withheld the relevant right or benefit from residents who failed to satisfy the temporal residency requirement -- whether the right to vote (Dunn, supra), entitlement to a civil service employment preference (Soto-Lopez, supra), entitlement to hospitalization medical care for the indigent (Memorial Hosp., supra), or entitlement to welfare benefits (Shapiro, supra).  By contrast, under the Commonwealth's licensing scheme, nonresidents who wish to publicly carry firearms in the Commonwealth are not categorically barred from so doing for any period of time, so long as they obtain a license pursuant to § 131F prior to entry and public carry.  Accordingly, insofar as the defendant's right to travel argument relies on these component cases, that reliance is misplaced.
            [17] We note that some United States Courts of Appeals evaluating Second Amendment and equal protection challenges to firearm regulations have treated the analysis required by the latter as subsumed under the analysis required by the former.  See, e.g., Pena v. Lindley, 898 F.3d 969, 986 (9th Cir. 2018), cert. denied sub nom. Pena v. Horan, 141 S. Ct. 108 (2020) ("To the extent that the Equal Protection challenge is based on the Second Amendment's fundamental right to bear arms and the disparate treatment of groups in exercising that right, as recognized by [the United States Supreme Court], that challenge is subsumed in the Second Amendment inquiry above"); United States v. Carey, 602 F.3d 738, 741 n.2 (6th Cir.), cert. denied, 562 U.S. 895 (2010) (declining to consider claims that "conflate the enumerated Second Amendment right with Equal Protection and Due Process protections under the Fifth Amendment").  Nevertheless, in the interest of completeness, we conduct a full and separate review of the defendant's equal protection claim.
            [18] The renewal provision in § 131F was amended in light of Bruen to eliminate discretionary language.  Specifically, the prior iteration of § 131F provided that a "license shall be valid for a period of one year but the colonel may renew such license, if in his discretion, such renewal is necessary."  G. L. c. 140, § 131F, as amended through St. 2014, c. 284, §§?60, 63.  See St. 1998, c. 180, § 46.  The current iteration excises the phrase "in his discretion" and provides that a "license shall be valid for a period of one year but the colonel may renew such license if such renewal is necessary."  G. L. c. 140, § 131F.  The defendant does not argue that the nonresident renewal provision as amended confers any additional discretion on the colonel with respect to renewing nonresident licenses as compared to issuing first-time nonresident licenses.  Context and purpose confirm that the current nonresident renewal provision does not import discretion.  First, the paragraph that immediately precedes the renewal provision states the eligibility conditions for nonresident license applicants:  such applicants "shall be issued" a temporary firearms license so long as they are neither prohibited nor unsuitable.  The nonresident renewal provision does not modify those conditions; on the contrary, it presupposes their satisfaction.  It merely specifies that, if a nonresident renewal applicant intends to continue to publicly carry firearms within the Commonwealth after one year such that it is "necessary" to continue to possess a valid firearms license in order to lawfully do so, the colonel is fully authorized to renew the license in question, so long as there has been no change to the applicant's suitability or prohibition status.  Hence, although the nonresident renewal provision employs the phrase "may renew" to describe the colonel's renewal authorization, in the context of the Commonwealth's "shall issue" nonresident licensing scheme, this phrase does not import any discretion.  Second, "we construe statutes to avoid constitutional problems where possible."  Maloney, 447 Mass. at 589.  Pursuant to that principle, any ambiguity with respect to whether the nonresident renewal provision imports discretion would be resolved in favor of the foregoing construction, as it avoids squarely implicating fundamental constitutional rights.  In sum, nonresident license renewal applicants are subject to the same substantive eligibility conditions as nonresident first-time license applicants.